[No. F028725. Fifth Dist. June 24, 1998.]

EUGENE KAZENSKY et al, Plaintiffs and Appellants, v.
CITY OF MERCED, Defendant and Appellant.

## COUNSEL

Beeson, Tayer & Bodine, Robert Bonsall and Jason Rabinowitz for Plaintiffs and Appellants.

Steven F. Nord, City Attorney, for Defendant and Appellant.

## OPINION

**ARDAIZ, P. J.—**

### INTRODUCTION

It has long been the rule that "[t]he penalty imposed by an administrative body will not be disturbed in mandamus proceedings unless an abuse of discretion is demonstrated" and that "[n]either an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed." (*Barber* v. *State Personnel Bd.* (1976) 18 Cal.3d 395, 404 [134 Cal.Rptr. 206, 556 P.2d 306].) In part II of this opinion we apply this well-established rule, and we conclude that the City of Merced did not abuse its discretion in terminating the employment of two city mechanics who committed numerous and repeated violations of the city's personnel rules.

Eugene Kazensky and Rusty Mileur (hereafter sometimes respondents) were mechanics employed by the City of Merced. The city attempted to discover a possible cause of vandalism to city vehicles by installing a hidden video surveillance camera at the city shop where the vehicles were repaired. The hidden camera did not film any incidents of vandalism, but did capture respondents taking grossly excessive breaks. It also captured respondent Mileur engaging in other inappropriate behavior. The city's director of

public works operations gave respondents notice that their employment would be terminated and, after a so-called *"Skelly* hearing,"[1] did terminate their employment. Respondents challenged their dismissals. The City of Merced Personnel Board held an evidentiary hearing which spanned parts of five days in March and April of 1995. The personnel board unanimously recommended that the city manager uphold the termination of respondent Mileur. It recommended, by a vote of three to two, that respondent Kazensky be reinstated without backpay and with a two-step demotion. The two dissenters voted to recommend termination of respondent Kazensky also.

Pursuant to the city charter and the city's personnel rules, the city manager listened to a tape recording of the personnel board hearing and considered the evidence offered at the hearing and the recommendation of the personnel board. The city manager upheld the termination of Mileur. He rejected the board's recommendation that Kazensky be reinstated, and upheld the decision of the director of public works operations to terminate Kazensky also. Respondents then petitioned the superior court for a writ of mandate. The court exercised its independent judgment on the evidence. The court found, among other things, that respondents did indeed take excessive breaks and that respondent Mileur did engage in other inappropriate behaviors. But the court concluded that the city's termination of respondents' employment was "excessive as a matter of law" and that "[u]nder the circumstances, the City was required to use progressive discipline, to advise, consult and admonish them, and give them an opportunity to correct their behavior." The court entered its judgment commanding the reinstatement of both respondents. The city has appealed and contends that the court erred in ordering reinstatement. Respondents have cross-appealed and contend that the court erred in denying their requests for attorney fees and for an award of backpay. As we shall explain, we conclude that the superior court erred in directing the city to reinstate the two respondents.

We will begin with a brief factual overview. Then we will restate the legal principles applicable to judicial review of administrative proceedings such as this one. Finally we will list the legal issues raised by the parties and will address each of those issues.

FACTS

The city's mechanics traditionally worked from 7:00 a.m. to 3:30 p.m. Monday through Friday. In 1994 the city decided to attempt to provide better and more efficient service to city vehicles and their users by instituting a "swing shift." The swing shift mechanics would work from 2:30 p.m. to

---

[1]*Skelly* v. *State Personnel Bd.* (1975) 15 Cal.3d 194 [124 Cal.Rptr. 14, 539 P.2d 774].

11:00 p.m. One of the objectives sought to be achieved by establishment of a swing shift was to provide a time during which "preventive maintenance" could be performed on the vehicles with the least possible inconvenience to the users. Also, using the same work area at two different times was deemed to be more cost efficient than the alternative of constructing a new repair shop to create more work space. Respondents Kazensky and Mileur were two of the three employees selected to work the swing shift. Although they received a small increase in pay for working the swing shift, both were unhappy about having been selected to work the new shift. During the first month of the new shift, all three swing shift employees used considerable amounts of sick leave. Incidents of vandalism to city vehicles increased considerably. These incidents were reported to the police. The police suggested instituting electronic surveillance of the city's shop area.

The city placed a hidden video camera in the shop. It ran from about 4:30 p.m. through the end of the swing shift on each of 21 days between September 14 and October 14, 1994, inclusive. It did not capture any incident of an employee vandalizing a city vehicle. It did, however, capture the three employees routinely taking breaks which were longer than, and indeed sometimes multiples of, their authorized two 15-minute breaks and one 30-minute "lunch" break.[2] It also captured respondent Mileur engaging in other acts of misconduct. These included working on his lawn mower at the city's shop on city time, taking papers out of other employees' mail slots and making copies of those papers, taking a sealed envelope out of another employees' mail slot and unsealing the envelope and looking at its contents, and taking a can of oil from another employee's toolbox. On October 7 respondent Mileur simply left and went home two and a half hours early, but reported that he had worked a full eight-hour day and got paid for an eight-hour day. Both Kazensky and Mileur attended a union meeting held at the shop from approximately 4:30 p.m. to 6:00 p.m. on October 6. The significance of it was not that it was a union meeting, but rather that it was part of the more than two hours and twenty minutes of break time taken by each of the two men on that date. When respondents' boss, Internal Services Manager David Morgan, noticed that items on his desk were not as he had left them in his locked office at the end of the day shift, he had the hidden camera installed in his office. It captured respondent Mileur entering Morgan's office on two separate dates in November. On each of those two occasions Mileur looked at various papers on Morgan's desk for a few minutes. Mileur did not force his way into Morgan's office. A custodian

---

[2]Former article V, section 5.02(A) of the City's personnel rules stated in pertinent part "each employee shall be entitled to an unpaid 30-minute meal period during each shift." Section 5.03 stated in pertinent part, "[e]ach employee shall be granted one (1) rest period not to exceed 15 minutes during each half shift of 4 hours."

came by to clean Morgan's office between 6:00 and 7:00 p.m., and Mileur entered after the custodian unlocked the door to enter and clean the office.

We will address other substantive and procedural facts pertinent to this appeal in our subsequent discussions of the issues to which those facts pertain.

## JUDICIAL REVIEW OF ADMINISTRATIVE DECISIONS

Superior court review of administrative decisions is governed by Code of Civil Procedure section 1094.5, which states in relevant part:

"(b) The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.

"(c) Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence." The statute distinguishes between "cases in which the court is authorized by law to exercise its independent judgment on the evidence" (Code Civ. Proc., § 1094.5, subd. (c)) and cases in which the court is not so authorized. Sometimes a statute will expressly direct the superior court to exercise its independent judgment in cases in which it reviews the findings of a particular agency. For example, Education Code section 44945 provides that in certain cases heard by the Commission on Professional Competence involving teacher dismissals, "[t]he court, on review, shall exercise its independent judgment on the evidence." ■ Even if there is no statute expressly directing the superior court to exercise its independent judgment on the evidence, the California Supreme Court has held that in certain types of cases the court must nevertheless exercise independent review. "If the order or decision of the agency substantially affects a fundamental vested right, the trial court, in determining under section 1094.5 whether there has been an abuse of discretion because the findings are not supported by the evidence, must exercise its independent judgment on the evidence and find an abuse of discretion if the findings are not supported by the weight of the evidence." (*Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 32 [112 Cal.Rptr. 805, 520 P.2d 29]; *Halaco Engineering Co.* v. *South Central Coast Regional Com.* (1986) 42 Cal.3d 52, 64, fn. 10

[227 Cal.Rptr. 667, 720 P.2d 15]; see also *Bixby* v. *Pierno* (1971) 4 Cal.3d 130 [93 Cal.Rptr. 234, 481 P.2d 242]; *Berlinghieri* v. *Department of Motor Vehicles* (1983) 33 Cal.3d 392 [188 Cal.Rptr. 891, 657 P.2d 383]; and *Hughes* v. *Board of Architectural Examiners* (1998) 17 Cal.4th 763, 789 [72 Cal.Rptr.2d 624, 952 P.2d 641].) Such a fundamental vested right is involved in the present case. "Discipline imposed on city employees affects their fundamental vested right in their employment." (*McMillen* v. *Civil Service Com.* (1992) 6 Cal.App.4th 125, 129 [8 Cal.Rptr.2d 548]; in accord, see *Schmitt* v. *City of Rialto* (1985) 164 Cal.App.3d 494, 500 [210 Cal.Rptr. 788].) Accordingly, ". . . the superior court was required to exercise its independent judgment on the evidence and find an abuse of discretion if the [agency's] findings of [the employee's] misconduct were not supported by the weight of the evidence." (*Boctor* v. *Los Angeles County Metropolitan Transit Authority* (1996) 48 Cal.App.4th 560, 573 [55 Cal.Rptr.2d 861]; in accord, see *Strumsky, supra,* 11 Cal.3d at p. 44; *Anton* v. *San Antonio Community Hosp.* (1977) 19 Cal.3d 802, 820-821 [140 Cal.Rptr. 442, 567 P.2d 1162]; *Mohilef* v. *Janovici* (1996) 51 Cal.App.4th 267, 305 [58 Cal.Rptr.2d 721]; *Barber* v. *Long Beach Civil Service Com.* (1996) 45 Cal.App.4th 652, 658 [53 Cal.Rptr.2d 4]; *California Real Estate Loans, Inc.* v. *Wallace* (1993) 18 Cal.App.4th 1575, 1580 [23 Cal.Rptr.2d 462]; and *Schmitt* v. *City of Rialto, supra,* 164 Cal.App.3d at p. 500.)

■ After the superior court has rendered its judgment, however, a different standard of review applies to the appellate court. "Where a superior court is required to make such an independent judgment upon the record of an administrative proceeding, the scope of review on appeal is limited. An appellate court must sustain the superior court's findings if substantial evidence supports them. (*Moran* v. *Board of Medical Examiners* (1984) 32 Cal.2d 301, 308-309 [196 P.2d 20]; *Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67, 71-73 [64 Cal.Rptr. 785, 435 P.2d 553]; *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 143, fn. 10 [93 Cal.Rptr. 234, 481 P.2d 242]; *Harlow* v. *Carleson* (1976) 16 Cal.3d 731, 739 [129 Cal.Rptr. 298, 548 P.2d 698].) In reviewing the evidence, an appellate court must resolve all conflicts in favor of the party prevailing in the superior court and must give that party the benefit of every reasonable inference in support of the judgment. When more than one inference can be reasonably deduced from the facts, the appellate court cannot substitute its deductions for those of the superior court. (*Moran* v. *Board of Medical Examiners, supra,* 32 Cal.2d at p. 308.)" (*Pasadena Unified Sch. Dist.* v. *Commission on Professional Competence* (1977) 20 Cal.3d 309, 314 [142 Cal.Rptr. 439, 572 P.2d 53].)

"Evidence is substantial if any reasonable trier of fact could have considered it reasonable, credible and of solid value." (*Kearl* v. *Board of Medical*

*Quality Assurance* (1986) 189 Cal.App.3d 1040, 1052 [236 Cal.Rptr. 526]; *Lam* v. *Bureau of Security & Investigative Services* (1995) 34 Cal.App.4th 29, 36 [40 Cal.Rptr.2d 137].) An appellate court will reverse a trial court's decision not only when the trial court's decision is not supported by substantial evidence, but also when the trial court's decision is based on an erroneous conclusion of law. (*Magit* v. *Board of Medical Examiners* (1961) 57 Cal.2d 74 [17 Cal.Rptr. 488, 366 P.2d 816].) An appellate court will also reverse the trial court judgment if the trial court has failed to make a necessary factual determination. (*Allegretti* v. *Bd. of Osteopathic Examiners* (1956) 145 Cal.App.2d 435 [302 P.2d 694]; *Barber* v. *Long Beach Civil Service Com.*, *supra*, 45 Cal.App.4th 652.)

■ When the superior court has conducted its review and has concluded that the agency properly found misconduct, the imposition of the appropriate penalty for that misconduct is left to the sound discretion of the agency. "The penalty imposed by an administrative body will not be disturbed in mandamus proceedings unless an abuse of discretion is demonstrated." (*Barber* v. *State Personnel Bd.*, *supra*, 18 Cal.3d at p. 404.) "Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed." (*Ibid.*) A significant aspect of this principle of judicial review is that it applies even when the superior court exercises its independent judgment on the evidence (i.e., "weighs" the evidence) in determining whether the agency abused its discretion in finding misconduct. (See, e.g., *Schmitt* v. *City of Rialto*, *supra*, 164 Cal.App.3d at pp. 500-501; *Martinez* v. *County of Tulare* (1987) 190 Cal.App.3d 1430, 1438 [235 Cal.Rptr. 851]; *Bailey* v. *City of National City* (1991) 226 Cal.App.3d 1319, 1325, fn. 4 [277 Cal.Rptr. 427]; *Talmo* v. *Civil Service Com.* (1991) 231 Cal.App.3d 210, 226-228 [282 Cal.Rptr. 240]; *Marek* v. *Board of Podiatric Medicine* (1993) 16 Cal.App.4th 1089, 1099 [20 Cal.Rptr.2d 474]; *West Valley-Mission Community College Dist.* v. *Concepcion* (1993) 16 Cal.App.4th 1766, 1778-1779 [21 Cal.Rptr.2d 5]; *California Real Estate Loans, Inc.* v. *Wallace*, *supra*, 18 Cal.App.4th at p. 1580; *Lam* v. *Bureau of Security & Investigative Services*, *supra*, 34 Cal.App.4th at p. 41; *Boctor* v. *Los Angeles County Metropolitan Transit Authority*, *supra*, 48 Cal.App.4th at pp. 574-575; and *Davis* v. *Civil Service Com.* (1997) 55 Cal.App.4th 677, 686 [64 Cal.Rptr.2d 121]. See also Cal. Administrative Mandamus (Cont.Ed.Bar 1989) §§ 4.87, 14.26.)[3] Indeed, in *Barber* itself the court upheld an agency's dismissal of an employee. The

---

[3]There is one published case that appears to take the view that the court, and not the administrative agency, may determine the appropriate penalty for misconduct. That case, *Toyota of Visalia, Inc.* v. *Department of Motor Vehicles* (1984) 155 Cal.App.3d 315 [202 Cal.Rptr. 190], is not mentioned by either side. It is, however, an opinion of this court. *Toyota* made no mention of the California Supreme Court's *Barber* decision, nor of our own court's earlier decision in *Lake* v. *Civil Service Commission* (1975) 47 Cal.App.3d 224 [120 Cal.Rptr.

superior court "is not free to substitute its opinion for that of the administrative body as to an appropriate disciplinary measure." (*Bailey*, *supra*, 226 Cal.App.3d at p. 1325, fn. 4.) "The appellate court's review of the degree of discipline imposed . . . remains the same as that appropriate to the trial court: The discipline imposed will not be disturbed unless it is shown to have been a manifest abuse of discretion." (*Ibid.*) "Neither a trial court nor an appellate court is free to substitute its discretion for that of an administrative agency concerning the degree of punishment imposed." (*California Real Estate Loans, Inc.* v. *Wallace*, *supra*, 18 Cal.App.4th at p. 1580.) "In reviewing the exercise of this discretion we bear in mind the principle '[c]ourts should let administrative boards and officers work out their problems with as little judicial interference as possible . . . . Such boards are vested with a high discretion and its abuse must appear very clearly before the courts will interfere.' " (*Talmo* v. *Civil Service Com.*, *supra*, 231 Cal.App.3d at p. 230, quoting from *Maxwell* v. *Civil Service Commission* (1915) 169 Cal. 336, 339 [146 P. 869].) In determining whether an agency abused its discretion in assessing a particular penalty, a court will look to "whether reasonable minds may differ as to the propriety of a penalty imposed." (*Lake* v. *Civil Service Commission*, *supra*, 47 Cal.App.3d at p. 228; see also Cal. Administrative Mandamus, *supra*, § 4.87.) Judicial interference with the agency's assessment of a penalty "will only be sanctioned when there is an arbitrary, capricious or patently abusive exercise of discretion by the administrative agency." (*Lake* v. *Civil Service Commission*, *supra*, 47 Cal.App.3d at p. 228.)

## CONTENTIONS ON APPEAL

The City of Merced argues that the trial court erred in overturning the city manager's decision to terminate Kazensky and Mileur. The city contends (1) the trial court violated Code of Civil Procedure section 632 by failing to

452] where we stated at page 228: "In reviewing the penalty imposed by an administrative body, which is duly constituted to announce and enforce such penalties, neither a trial court nor an appellate court is free to substitute its own discretion as to the matter nor can the reviewing court interfere with the imposition of a penalty by an administrative tribunal because in the court's own evaluation of the circumstances the penalty appears to be too harsh. [Citations.] Such interference, in the light of the foregoing authorities, will only be sanctioned when there is an arbitrary, capricious or patently abusive exercise of discretion by the administrative agency. [Citation.]" The rule stated in *Lake* is the rule that has been followed in every case both before and after the *Toyota* decision. The *Toyota* decision has been criticized as an anomaly in subsequent published cases. (See *Schmitt* v. *City of Rialto*, *supra*, 164 Cal.App.3d 494 and *Talmo* v. *Civil Service Com.*, *supra*, 231 Cal.App.3d 210.) It appears that we too have simply ignored *Toyota* in subsequent cases. (See *Martinez* v. *County of Tulare*, *supra*, 190 Cal.App.3d at p. 1438, and *Nicolini* v. *County of Tuolumne* (1987) 190 Cal.App.3d 619, 626 [235 Cal.Rptr. 559].) To the extent that our *Toyota* decision departed from our earlier decision in *Lake*, we disapprove of *Toyota*, reaffirm *Lake*, and expressly realign this court with every other court that has addressed this issue.

resolve controverted issues, and by making ambiguous findings, (2) the court failed to discharge its duty to review the administrative record, and (3) the trial court erred in failing to defer to the city's decision on discipline. We will refer to the first two of these contentions as the city's "procedural arguments" and will address them below in part I of this opinion. In part II we will address the city's contention that the court erred in not deferring to the city's decision to terminate the two respondents. As we shall explain, that issue appears to us to be the most significant issue in the case. Respondents have cross-appealed and contend that the court erred in (1) not directing the city to award them backpay for the time period between their termination by the city and their reinstatement as ordered by the court, and (2) not awarding them attorney fees. We will address these issues in part III below.

## I.

### The City's Procedural Arguments

A brief review of certain procedural facts will help to clarify our following explanation of why we view the city's procedural arguments to be without merit. The city's department of public works manager for internal services, Mr. David Morgan, gave each of the respondents written notice that he would be "proposing that you be terminated from employment with the city of Merced" for reasons listed in the notice. Morgan was respondents' superior, and his office was located in the city building where respondents worked as mechanics. After a so-called "*Skelly* hearing"[4] at which respondents responded to the charges, the city's director of public works operations notified each respondent, "I have decided that it is appropriate to proceed with the action terminating you from your job . . . ." The director of public works operations was Mr. Nick Pinhey. Mr. Pinhey was superior to Mr. Morgan. Mr. Pinhey's notice to each respondent advised each respondent of the reasons for the termination. These notices of termination appear to have acted as the charging documents for purposes of respondents' subsequent evidentiary hearing before the five-member City of Merced Personnel Board.

Respondent Kazensky was charged with violating subdivisions D, I, L, Q, and AA of article XX, section 20.02 of the City of Merced Personnel Rules

---

[4]A "*Skelly* hearing" is a hearing afforded to the employee before the employee's termination becomes effective. (See *Skelly* v. *State Personnel Bd.*, *supra*, 15 Cal.3d 194.) This is not to be confused with the posttermination personnel board hearing later reviewed by the superior court.

on 19 separate dates (dates of videotaped surveillance) in September and October of 1994.[5] Specifically, the notice told Kazensky he had:

(1)   taken excessive breaks on 17 of the 19 dates. The excess time taken was listed for each of the 17 dates as 29, 66, 39, 53, 36, 54, 60, 71, 65, 77, 68, 51, 17, 29, 34, 15 and 11 minutes, respectively. These amounts were described as being amounts in excess of the allowed "lunch" and break times.[6]

(2)   participated in a "non City authorized meeting" for ninety-one minutes on one of the two dates for which no taking of excess breaks was alleged. (This charge appears to have been subsequently treated in essence as the equivalent of an unauthorized 91-minute break on that date.)

(3)   "allowed" other employees on the swing shift to take excessive breaks on 18 of the 19 dates. The amount of excess break time "allowed" was listed for each of the 18 dates as 78, 111, 62, 113, 111, 73, 213, 149, 162, 157, 137, 264, 63, 42, 118, 178, 16 and 23 minutes, respectively. These numbers appear to represent the combined excess break time allegedly taken by the two other swing shift employees, who were of lower rank than Kazensky. These numbers do not include the alleged excess break time taken by Kazensky himself.

(4)   allowed Mileur to leave early and then "clocked out" for him on September 15, 1994, and allowed Mileur to leave work an hour and a half early on October 7, 1994. The September 15 incident is alleged to have

---

[5]Article XX, section 20.02 states in pertinent part:
"The following may be causes for disciplinary action including, but not limited to, written reprimand, demotion, suspension, or dismissal of any employee. The purpose of specifying these causes is to alert employees to the more commonplace types of disciplinary issues. However, this list is not all inclusive and there may arise instances of unacceptable behavior not included in this list.
" . . . . . . . . . . . . . . . . . . . .
"D. Misconduct, willful or negligent violation of the personnel rules, resolutions, and other related ordinances including written departmental rules, regulations, and policies. [¶] . . . [¶] I. Fraud or the submission of false information related to employment application, payroll, or any work related record or report. [¶] . . . [¶] L. Conduct tending to interfere with the reasonable management, operation and discipline of the City or any of its departments or divisions or failure to cooperate reasonably with superiors or fellow employees. [¶] . . . [¶] Q. Inefficiency, incompetence, or negligence in the performance of duties, including failure to perform assigned tasks or training, or failure to discharge duties in a prompt, competent, and reasonable manner. [¶] . . . [¶] AA. Dishonesty."
[6]Videotaping of the shop area took place on September 14, 15, 19, 20, 21, 22, 23, 26, 27, 28, 29 and 30, and on October 3, 4, 5, 6, 7, 11, 12, 13 and 14, 1994. Of these 21 dates, 1 day of taping (October 13) was lost due to technical problems. Internal Service Manager David Morgan's office was next to the shop area and was also videotaped on November 16 and 18, 1994.

violated an Internal Services Division rule prohibiting any employee from "clocking out" another employee.

(5)  approved unnecessary overtime for Mileur on September 20, 1994.

(6)  allowed the other swing shift employees to use the copier to copy documents pertaining to other employees on September 21, September 27 and October 6, 1994, personally viewed other employees' improperly copied time sheets on September 27, 1994, and allowed Mileur to go through other employees' mailboxes on October 6, 1994. (Testimony at the personnel board hearing revealed that the swing shift employees had a fascination with whether the day shift employees were properly filling out the day shift employees' time sheets. No evidence of misconduct on the part of any day shift employees in September or October of 1994 was presented at respondents' hearing. The "mailboxes" were not closed boxes. They were described at the hearing as mail slots. By looking at them, one could see which slots contained documents or envelopes and which slots were empty.)

(7)  allowed Mileur to leave early on September 23, 1994.

(8)  allowed Mileur to work on Mileur's personally owned lawn mower on September 30, 1994.

(9)  allowed Mileur to use a city vehicle to pick up Mileur's lunch on October 5, 1994, and allowed another employee to use the phone for personal calls for more than a "reasonable period" of time on that date.

Respondent Mileur was charged with violating the same subdivisions D, I, L, Q and AA of article XX, section 20.02 of the City of Merced Personnel Rules on 18 separate dates (dates of videotaped surveillance) in September and October of 1994. He was also charged with violating those same provisions on two dates in November of 1994. Mileur's notice of termination alleged that he had:

(1)  taken excessive breaks on each of the 18 September and October dates.[7] The excess time taken was listed for each of those dates as 47, 33, 62, 39, 55, 95, 75, 92, 65, 52, 143, 63, 42, 118, 55, 39, 16 and 23 minutes, respectively. Just as with Kazensky, these amounts were described as being the numbers of minutes by which the breaks exceeded the allowed "lunch" and break times. It also alleged that he had "participated in a non City

---

[7]Mileur was absent from work (justifiably, it is assumed) on September 22 and October 4. Taping for October 13 was lost due to technical problems. This accounts for the other remaining three of the twenty-one dates of videotaping.

authorized meeting for 91 minutes" on October 6, 1994, but this 91 minutes appears to have been included in the alleged 118 minutes of excess break time for that date. Similarly, the notice alleged that he left work early on September 15, September 23 and October 7, 1994, but the missed worktime appears to have been included in the alleged excess break time for September 15 and September 23 (33 and 95 minutes, respectively). For October 7, the alleged excess break time (55 minutes) and early exit time were alleged separately, but at the hearing these amounts were combined by the city to allege a total excess break time of 149 minutes.

(2) gone through other employees' mailboxes on September 21, September 27, September 30, and October 6, 1994. It further alleged that he had removed, opened and read another employee's sealed document on September 21, participated in making copies on September 27 of documents taken from employee mailboxes, and did more copying on October 6 of documents taken from other employees' mailboxes.

(3) "clocked out" for another employee on September 30, 1994, after the other employee had left early.

(4) returned to the building on October 3, 1994, took a can of oil from another employee's tool cart, concealed the can in his coveralls and left.

(5) written "insulting and demeaning notes" which he left for the day crew. Evidence at the personnel board hearing revealed that on at least two occasions he left a note under a towel or rag on machinery he was working on. One of them said in part: "Surprise, asshole - don't you have something better to do than stand around and see what I am doing?" The other note was substantially similar and addressed the reader with the same seven-letter noun.

(6) repaired a refuse vehicle on October 12, 1994, and left it with loose lug nuts.

(7) claimed one hour of "unauthorized overtime" on September 20, 1994.

(8) "violated a department policy by going through confidential materials on your Manager's desk" on November 16 and November 18, 1994. Evidence at the personnel board hearing showed that Internal Services Manager David Morgan had a hidden surveillance camera installed in his office after items on his desk in his locked office appeared to have been tampered with. The camera captured Mileur following a custodian into the

office and looking at various items on Morgan's desk on November 16 and November 18, 1994. The custodian had a key and entered Morgan's office to clean it. Morgan testified that he could not recall what the papers were that Mileur had been filmed looking at. Both the city and Mileur, however, appear to have treated this charge as a charge of improperly entering the manager's locked office. Mileur testified that he had submitted a vacation request in August requesting vacation days in late November, and that he was trying to find out if his vacation request had been approved. He didn't just ask Morgan about it, even though the end of the day shift overlapped every day for one hour with the beginning of the swing shift.

At the personnel board hearing the evidence presented was virtually undisputed. Most of the incidents alleged had been captured on videotape. The board did not view the entire 23 days of videotapes. Instead, they viewed selected portions of the tapes from 13 different dates. This was done as Morgan testified, with Morgan narrating or describing what was being shown on the tapes. The defense was essentially that it was unfair to terminate respondents' employment without the city having first imposed some sort of lesser, progressive discipline. Respondents also argued that other employees had taken breaks longer than the allowed two breaks of fifteen minutes each and had not been fired, but there was no showing that other employees had taken nearly as much excess time as had respondents. Respondents' counsel also argued that Kazensky was "not a supervisor." It was not disputed that Kazensky had no power to hire and fire, but it was also not disputed that he was the person in charge of the swing shift.

The personnel board's decision stated in relevant part:

"The majority recommendation of the Personnel Board is based on the following findings:

"1.   All three employees, Mileur, Kazensky, and Percy, are long-time employees of the City of Merced.

"2.   With the exception of the written reprimand given to Mr. Mileur in June 1994, all three employees had excellent evaluation reports prior to their termination.

"3.   All three employees possess a high level of expertise, and the City of Merced has expended considerable time and money in training them to carry out their respective functions.

"4.   Even before these three employees began working on the swing shift in the corporation yard, there were incidents of vandalism. Because it was

suspected that vandalism was being carried out during the swing shift when there was no managerial supervision of the employees on said shift, the City determined to begin surveillance monitoring of the swing shift in order to determine whether or not vandalism was being committed on that shift. As part of this plan, video cameras were mounted above portions of the work area inside the mechanic shop.

"5. Surveillance of the swing shift did not reveal any incidents of vandalism by the three employees.

"6. Surveillance did show, however, that each of the three employees took excessive breaks in violation of City policy and the Memorandum of Understanding between the Teamsters Union and the City of Merced. Video surveillance also revealed that the subject employees copied other employees timecards and violated City policy by clocking out for each other on occasion. Surveillance further revealed that Rusty Mileur went through other employees' mail boxes, impermissibly entered the private office of supervisor David Morgan, though accompanied by the janitorial employee. Video surveillance further revealed that some type of employee/union meeting was held during work hours without permission. Finally, video surveillance revealed that Mr. Mileur, on one occasion, worked on his personal lawnmower during City time. The violations of the Memorandum of Understanding and City policy by Kazensky and Percy, though serious, do not, however, in light of other findings made in this recommendation, support the ultimate sanction of termination.

"7. Employee Eugene Kazensky was not a supervisor.

"8. In spite of the above-referenced violations, the swing shift, while these employees were on it, was, in the words of Mr. Morgan, 'productive and meeting its goals.'

"9. Management has the responsibility, pursuant to the most basic rules of supervision, to correct or modify employee behavior before resorting to termination. At no time during the course of surveillance of these employees, which occurred over an extended period of time, were they told to correct their deficiencies and violations of policy, which were clear from the video surveillance.

"10. There was a past practice of allowing employees in the corporation yard to occasionally take extended breaks. When employees abuse this privilege or practice, they were warned and counseled to discontinue it. At no time during the employment of the terminated employees, were they

informed that there was a change in the method or manner of operating the shop.

"11.   To the extent possible, discipline should be meted out even hand-edly. Co-employee Steve Harris, based on the evidence before the Board, clearly engaged in many, if not most, of the same acts of misconduct, as the terminated employees. Nevertheless, Mr. Harris was only given a written counseling dated November 29, 1994. Though the subject employees may indeed be deserving of more stringent discipline than that given to Mr. Harris, termination of their employment with the City of Merced is excessive.

"Based on the foregoing findings, the majority of the Personnel Board respectfully recommends that the termination of Eugene Kazensky and Donald Percy be rescinded, and that Mr. Kazensky be reinstated without back pay, but with a two-step demotion. Donald Percy should likewise be reinstated without back pay, but with a one-step demotion. The termination of Rusty Mileur should be upheld."

The city manager rejected the personnel board's recommendation that Kazensky be reinstated. The city manager decided that both respondents should be terminated. His decision stated in pertinent part:

"In re: Eugene Kazensky:

"Employee was terminated for violating various expressed sections of the City of Merced Personnel Rules contained in Employer Exhibit 5. The decision of the Personnel Board is overturned and the decision of the Department Head is affirmed. Employee Kazensky is terminated. Incorpo-rated in this decision are Personnel Board findings 1, 2, 3, 4, 5, and the portion of 6 not dealing with the seriousness of the violations.

"The following additional findings are offered in support of termination:

"a)   Class Specification for Mechanic III entered as Employer Exhibit 3 clearly defines acting as Equipment Superintendent in his absence; knowl-edge of basic supervisory techniques; ability to provide lead direction and supervise (emphasis added) [sic]; and, maintaining effective working rela-tionships with co-workers, other city employees . . . and City officials. Kazensky did not provide adequate supervision/lead responsibility. Kazen-sky also failed to maintain appropriate relationships with other employees.

"b)   Employee Performance reports accepted as Employee Exhibit B rated employee on four separate reports under the section 'employees who supervise.'

"c)   In testimony (Tape L side 2) employee described himself as a working supervisor.

"d)   Employee received additional compensation as Mechanic III and additional shift differential pay for performance of all (emphasis added) [*sic*] duties in class specification including lead/supervision responsibilities.

"e)   Employee testified that Internal Services Manager told employees there would be no changes in operations from when previous Equipment Superintendent Don Post was employed. Employee acknowledged supervisory responsibilities under Post.

"f)   Teamsters Union Counsel Bonsall admitted Management had right to create a swing shift and assign employees as management right under the Memorandum of Understanding.

"In re: Rusty Mileur:

"Employee was terminated for violating various expressed sections of the City of Merced Personnel Rules contained in Employer Exhibit 5. The decision of the Personnel Board and the Department Head is affirmed. Employee Mileur is terminated. Incorporated in this decision are Personnel Board findings 1, 2, 3, 4, 5, and portions of 6 not dealing with the seriousness of the violations.

"The following additional findings are submitted in support of termination:

"g)   Employee testified to working on a privately owned lawnmower during normal work hours (Tape O Side 1).

"h)   Employee testified to entering locked office of Internal Services Manager on 6-7 times (Tape O Side 1).

"i)   Class Specification requires ability to maintain effective work relationships with co-workers, other city employees . . . and city officials[.] Mileur did not. In fact, he testified to writing and leaving notes containing profanity. This added to the divisiveness of shop personnel. He also testified to a confrontational meeting with the Internal Services Manager in which he admitted staring/glaring construed by the Manager as intimidating. (See Employer exhibits 8 and 12).

"j)   Employee deliberately opened a sealed envelope in another employees['] inter-office mail box and made copies; and, on other occasions went

through other employees mailboxes and copied various documents without authorization.

"k)    Employee testified that as long as he was at the shop he was 'on-call' and eligible for pay. In the extreme, this behavior would mean employees should be compensated for their presence regardless of work performed. While it is recognized employee is compensated on an hourly basis, this line of reasoning is certainly inappropriate. Being 'on-call' is not during normal work hours.

"l)    Employee admitted not fully tightening lug nuts on refuse truck (Tape N Side 2). The skill level of this position demands competent performance of repairs for the safety of the citizens and employees of the City of Merced.

"m)    Teamsters Union Counsel Bonsall admitted Management had right to create a swing shift and assign employes [*sic*] as a management right under the Memorandum of Understanding.

"     .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"In closing, public employees are under constant scrutiny. We must be ever vigilant to being responsible and accountable. The actions of the three appellants creates the perception of willful, repeated, patterned disobedience. The actions singularly and combined are defiant and retributive to management's expressed goals of efficiency and accountability.

"It is not easy to terminate long tenured employees who have received specialized training at the City's expense. This was an investment made at the expense of the taxpayers who will not now receive the benefits of their investment. Such investment anticipated integrity, honesty, and a return of well maintained, safe publicly owned and operated equipment. As an institution, the City cannot accept anything less.

"While it has been argued that the management should have intervened sooner, this in no way rebuts or mitigates the severity or magnitude of the violations.

"The Personnel Board has made other findings not incorporated into my decision. Those findings identified below were not included for the following reasons:

"Finding 7—Explained in findings supporting termination of Kazensky.

"Finding 8—The productivity issue was raised by a Boardmember in re: swing shift. Internal Services Manager testified that productivity was met (Tape 5 Side 2). This was clarified under questioning by Union Counsel wherein Internal Services Manger testified that productivity was met 'on paper' (false work orders/time sheets) but not on work completed based on review of the videotapes (Tape I Side 2).

"Finding 9—Management does have responsibility to correct employee behavior; however, many of the rules/policies violated appeared to be intentional. Such intentional behavior, overtime,[8] was very costly to the City in both actual dollars and lost opportunity.

"Finding 10—There may be a practice of extended breaks in the shop. Retired Equipment Superintendent Post testified to 'flexible breaks'. There is no visible effort made by employees to compensate for long breaks by taking short breaks in the videos. If the practice was indeed flexible, employees failed to follow practice.

"Finding 11—Testimony was provided differentiating employee Harris from the three appellants due to shift and location responsibilities."

In ruling on respondents' petition for writ of mandate, the superior court reached a conclusion different than that of both the personnel board and the city manager. The court concluded that both employees should be reinstated. The court's ruling stated in pertinent part:

"FINDINGS OF FACT

"The court found that it was required to exercise its own independent judgment regarding the findings of fact. In the exercise of its independent judgment, the Court found the following facts:

"1.   Mr. Kazensky and Mr. Mileur were long-time employees of the City.

"2.   Mr. Kazensky and Mr. Mileur had excellent evaluation reports prior to their termination.

"3.   Mr. Kazensky and Mr. Mileur both possess a high level of expertise, and the City has expended considerable time and money in training them to carry out their functions.

"4.   There were incidents of vandalism before Petitioners were working in the swing shift.

---

[8]The word "overtime" appears to have been intended as "over time" and not as a reference to Mileur's alleged one hour of improper overtime on September 20.

"5.    The City acted properly in setting up the surveillance camera for the purpose of determining if Petitioners committed the vandalism.

"6.    The surveillance camera did not reveal any incidents of vandalism by Mr. Kazensky and Mr. Mileur.

"7.    Surveillance did show that Petitioners took excessive breaks and copied each other's time cards and clocked out for each other on occasion.

"8.    Mr. Mileur went through other employees' mail boxes.

"9.    Mr. Mileur impermissibly entered the private office of Mr. Morgan, although he was accompanied by a janitorial employee, and the evidence suggests that for some period of time prior to this, the office was left open and employees frequently went in there.

"10.    Mr. Mileur on one occasion worked on his personal lawnmower during City time.

"11.    Mr. Kazensky was not a supervisor.

"12.    The evidence does not support a conclusion that there was any conspiracy to sabotage the swing shift or that Petitioners defied work assignments in any sense other than the fact that they did take excessive breaks.

"13.    Mr. Mileur was not guilty of failure to maintain effective work management or to perform his job competently.

"14.    The City failed to warn Mr. Kazensky or Mr. Mileur or give them any opportunity to correct their behavior through progressive discipline.

"CONCLUSIONS OF LAW

"THEREFORE, the Court makes the following conclusions of law:

"The termination of Mr. Kazensky and Mr. Mileur is excessive as a matter of law. Under the circumstances, the City was required to use progressive discipline, to advise, consult and admonish them, and give them an opportunity to correct their behavior."

With this procedural background in mind, we now turn to the city's procedural arguments.

A.    *The Trial Court Reviewed the Administrative Record*

As we have already explained in our discussion above about judicial review of administrative decisions, the court was required to review the

administrative record and conduct its own weighing of the evidence. The city contends that the court committed reversible error by not viewing the tapes. Under the circumstances of this case, we disagree. This is because the conduct shown on the tapes had been testified to by witnesses at the personnel board hearing, and there was no significant dispute about what the videotapes showed. The videotapes filmed several hours per day for each of 23 days. The personnel board viewed portions of some of the tapes. The city manager did not view them at all. His decision was prefaced with a statement that he had conducted a "careful and solemn review" of the record but "did not view the video tapes."

The closest thing to a significant factual dispute was some bickering between the City and the respondents over the precise amounts of time the videotapes showed respondents not working. Morgan prepared a summary of those amounts. It was based upon his viewing of the tapes, and was entered into evidence at the personnel board hearing. The respondents offered their own summaries, which were also offered and accepted into evidence. According to the city, the number of minutes Mileur spent not working on each of the 18 dates on which he was videotaped in September and October was 78, 98, 115, 69 (in a half day of taping on Sept. 20), 100, 197 (including 66 minutes attributable to leaving 66 minutes early on Sept. 23), 127, 143, 125, 94, 192, 102, 86, 181 (on Oct. 6 and including 92 minutes for the union meeting held on that date), 209 (on Oct. 7 and including the 2 hours and 23 minutes from Mileur's early 8:27 p.m. departure on that date to the 11:00 p.m. end of the shift), 86, 74 and 63, respectively.[9] According to respondents, the number of minutes Mileur spent not working on those same dates was 68, 87, 115, 69 (in the half a day of taping on Sept. 20), 90, 95 (on Sept. 30 and not including an additional 66 at the end of his shift during which he is not seen but contends he was working outside sweeping in a sweeper truck), 127, 126, 114, 93, 142, 93, 78, 144 (on the day of the Oct. 6 union meeting and including his time spent at that meeting), 75 (on Oct. 7 and not including the 2 hours and 23 minutes from his 8:27 p.m. departure to the 11:00 p.m. end of shift), 86, 61 and 61, respectively. For Kazensky, the city's summary of his minutes spent not working on the 20 dates on which he was taped was 64, 125, 93, 68 (in a half day of taping on Sept. 20), 97, 115, 149, 130, 123, 127, 128, 99, 46 (i.e. 14 minutes less than allowed, on Oct. 3), "normal times" (apparently 60 minutes, on Oct. 4), 72, 162 (on day of Oct. 6 union meeting), 43, 86, 61 and 57, respectively. Respondents' summary of Kazensky's minutes spent not working on those same 20 dates

---

[9]Mileur was of course entitled to 60 of these minutes on each full day of taping. (See fn. 2, *ante*.) There was some evidence to suggest that respondents became aware of the surveillance camera on October 3, 4 or 5. Mileur was absent on October 4. On October 5 he was filmed making an obscene gesture at the room, and on October 6 the union meeting took place at the shop.

was 59, 117, 132, 67 (in half a day of taping on Sept. 20), 92, 111, 133, 130, 115, 104, 111, 87, 45, "normal times" (on Oct. 4), 71, 149 (on day of Oct. 6 union meeting), 43, 85, 59 and 55, respectively. The personnel board found that respondents took "excessive breaks in violation of City policy and the Memorandum of Understanding between the Teamsters Union and the City of Merced." The city manager incorporated that same finding into his own decision. The superior court similarly found that respondents took "excessive breaks." The board, the city manager and the superior court all found no need to further fine-tune this particular finding, and neither do we. The court did not err in not viewing the tapes.

B. *The Superior Court Did Not Violate Code of Civil Procedure Section 632*

Code of Civil Procedure section 632 states in pertinent part: "In superior . . . courts, upon the trial of a question of fact by the court, written findings of fact and conclusions of law shall not be required. The court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial upon the request of any party appearing at trial."[10] Although the superior court matter in this case was an administrative mandamus proceeding in which the court reviewed evidence that had been presented to the personnel board and exercised its independent judgment on that evidence (see *Strumsky* v. *San Diego County Employees Retirement Assn.*, *supra*, 11 Cal.3d 28), this was a "trial of a question of fact" within the meaning of Code of Civil Procedure section 632. ■ "It is . . . well established that Code of Civil Procedure section 632 applies to administrative mandamus proceedings in which the trial court exercises its independent judgment in reviewing the record." (*Cooper* v. *Kizer* (1991) 230 Cal.App.3d 1291, 1301 [282 Cal.Rptr. 492]; in accord, see *Bevli* v. *Brisco* (1985) 165 Cal.App.3d 812, 819-822 [212 Cal.Rptr. 36]; and 8 Witkin, Cal. Procedure (4th ed. 1997) Extraordinary Writs, § 329.)

"A trial court rendering a statement of decision under Code of Civil Procedure section 632 is required only to state ultimate rather than evidentiary facts. A trial court is not required to make findings with regard to detailed evidentiary facts or to make minute findings as to individual items of evidence. Only where a trial court fails to make findings as to a material issue which would fairly disclose the determination by the trial court would reversible error result. Even though a court fails to make a finding on a

---

[10]The city actually cites Code of Civil Procedure section 634 and not Code of Civil Procedure section 632, but section 634 of the Code of Civil Procedure does not direct the superior court to do anything at all. Code of Civil Procedure section 632 sets forth the law applicable to a trial court's statement of decision.

particular matter, if the judgment is otherwise supported, the omission is harmless error unless the evidence is sufficient to sustain a finding in favor of the complaining party which would have the effect of countervailing or destroying other findings. A failure to find on an immaterial issue is not error. [Citation.] In issuing a statement of decision, the trial court need not address each question listed in a party's request. All that is required is an explanation of the factual and legal basis for the court's decision regarding such principal controverted issues at trial as are listed in the request. [Citation.]" (*Nunes Turfgrass, Inc.* v. *Vaughan-Jacklin Seed Co.* (1988) 200 Cal.App.3d 1518, 1525 [246 Cal.Rptr. 823]; in accord, see also *People* v. *Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 524-525 [206 Cal.Rptr. 164, 53 A.L.R.4th 661]; 7 Witkin, Cal. Procedure, *supra*, Trial, § 411.)

■ The city contends that the court failed to make findings on eight "principal controverted issues." (Code Civ. Proc., § 632.) According to the city, these are:

(1) Mileur's leaving profane notes for his fellow employees to find.

(2) Mileur's theft of a can of WD-40 oil from another employee's tool chest.

(3) Mileur's failure to tighten lug nuts on a refuse truck.

(4) The holding of a union meeting on city time.

(5) The opening of a sealed envelope of another employee by Mileur.

(6) Kazensky's involvement in the illegal entry of Mileur into Morgan's locked office.

(7) The falsifying of work orders and timecards by respondents.

(8) The unnecessary approval of overtime by Kazensky and the taking of that overtime by Mileur on September 20, 1994.

Respondent admits that all of these "issues" were undisputed except for number "(2)." As to issue "(2)" (the can of oil), that issue was not deemed significant by either the personnel board or the city manager. The personnel board did not mention it in its recommendation to the city manager, and the city manager did not mention it in his decision. Also, for what it's worth, the city did not expressly charge Mileur with "theft." Mileur's notice of termination asserted that on October 3, 1994, Mileur had "removed" from the

building "one can of WD-40 taken from another employee's tool cart." This incident was videotaped and was shown to the personnel board at the hearing. Morgan explained that the tool cart from which Mileur was seen taking the can of oil was a tool cart used by a Mr. Juneman. He also testified, however, that the cans of oil were paid for by the city. Whatever this incident was, therefore, it was not a theft of property owned by another employee. For our purposes, however, the important point is that the superior court was not required to make any finding on the oil can incident. The city had made no finding on it. The court therefore could not decide whether the city's nonexistent finding on the oil can incident was supported by the weight of the evidence (Code Civ. Proc., § 1094.5, subd. (c); *Strumsky* v. *San Diego County Employees Retirement Assn.*, *supra*, 11 Cal.3d 28).

We also note, as to the city's item No. "(6)," that respondent Kazensky was never charged with any "involvement in" Mileur's November 16 and November 18 entries into Morgan's office. Kazensky was not charged with engaging in any misconduct on either of those two dates. Only Mileur was charged with misconduct on those two dates. It is therefore not surprising that neither the personnel board nor the city manager made any finding as to Kazensky's uncharged "involvement in" Mileur's entry into Morgan's office. And as to the city's item "(4)," the city alleged that each of the two respondents "participated in a non City authorized meeting for 91 minutes" on October 6, 1994. Whether this event was a union meeting or not was insignificant. In essence, it was treated throughout these proceedings as just another excessive break. And once again neither the personnel board nor the city manager made any finding about any "union meeting" or about any other type of meeting.

The city next contends that the superior court's findings Nos. 7, 9, 10, 11, 12 and 13 (all quoted in full above in our summary of the superior court's ruling) are either "ambiguous" or "not supported by the record." We see no ambiguity of any significance. As to the city's contention that certain of the court's findings are not supported by the record, that is another matter having nothing to do with Code of Civil Procedure section 632. As we explained in our above-stated review of the law pertaining to judicial review of administrative decisions, whether the court's findings are supported by the record is a matter of substantial evidence review. "An appellate court must sustain the superior court's findings if substantial evidence supports them." (*Pasadena Unified Sch. Dist.* v. *Commission on Professional Competence*, *supra*, 20 Cal.3d at p. 314.)

As to the superior court's finding No. 7, the city contends that the term "excessive breaks" is ambiguous. As we have already explained, respondents' breaks were "excessive" no matter which side's calculations of the break times are used.

As to finding No. 9, the city describes it as "ludicrous and outrageous." The city appears to view the court's finding No. 9 as a finding that Mileur did not enter an office which had been locked. We do not so read that finding. The essence of the finding is in its first clause, i.e., "Mr. Mileur improperly entered the private office of Mr. Morgan." The rest of it is just a reference to other undisputed evidence, namely that (1) Mileur didn't break the door down or pick the lock, but rather followed the custodian into the office after the custodian had unlocked it to clean it, and (2) at an earlier time, prior to the dates on which Mileur entered the locked office, the office had been left unlocked.

As to finding No. 10, the court stated, "Mr. Mileur on one occasion worked on his personal lawnmower during City time." The city argues "[t]he actual evidence was that while Mileur was caught on tape only once, he admitted working on personal equipment on several other occasions." We think the superior court's statement is more accurate than the city's. When one of the personnel board members asked Mileur at the hearing how often Mileur had worked on personal property on city time, Mileur said "one or two times the whole time I was working at the City." There was no testimony that he worked on his personal lawn mower on more than one occasion. The videotape caught him doing this one time, on September 30, and the superior court's ruling acknowledges this one instance. Most importantly, however, Mileur was never charged with working on personal property on city time. His notice of termination made no mention of it at all. This time was just considered more "break" time or time not working, and in fact was so characterized by the city in its presentation to the personnel board.

As to the superior court's finding No. 11 that "Mr. Kazensky was not a supervisor," we fail to see the significance of it. The city alleged in its notice of termination that Kazensky had "allowed" the excessive breaks of Mileur and another swing shift employee, and had "allowed" other misconduct of Mileur to occur. The evidence was that the city created the swing shift and that Morgan placed Kazensky in charge of it. Kazensky was the highest ranking employee on the shift, "a mechanic III." He was the only "mechanic III" employed by the city. Mileur was a "mechanic II." Kazensky's "mechanic III" job description described one of his duties as "Acts as Equipment Superintendent in his absence." It was not disputed that the "Equipment Superintendent" was Morgan, even though the name of Morgan's job title had apparently changed and the "mechanic III" job description had not been updated to reflect the new title of what had previously been known as the equipment superintendent. Morgan described his job title at the time of the hearing as "Internal Services Manager for the Public Works Department." It was not disputed that Morgan was absent during the swing shift, except for

the last hour or two of Morgan's own working hours, which were during the day. Kazensky's "mechanic III" job duties also included "[a]ssigns, supervises and performs all types of maintenance and repair work on City vehicles." The listed qualifications for the post of "mechanic III" included "[k]nowledge of basic supervisory techniques." There was further no dispute that Kazensky did not have the authority to hire and fire. The superior court's finding that Kazensky "was not a supervisor" appears to have been taken from, or perhaps inspired by, the personnel board's identical finding in its finding No. 7. If this finding was meant to point out that Kazensky was not in what might be called a management position, and to perhaps imply that less might be expected of him in terms of supervisory capability or performance than what might be expected of a manager such as Morgan, we see no problem with it. If it is meant to be a finding that Kazensky had no supervisory responsibility whatsoever over Mileur, that would be contrary to the evidence. Under that view, Kazensky would not be responsible even if Mileur had not shown up for work at all, except to fill out a time card saying that he had worked eight hours on the swing shift. The city could and did reasonably expect more than that from the person in charge of the swing shift, Kazensky. It did not expect Kazensky to fire Mileur or to attempt to personally impose some sort of discipline on Mileur. It expected Kazensky to report any problems to Morgan. Kazensky had an opportunity to do this each weekday from 2:30 to 3:30 p.m. when the start of the swing shift overlapped with the end of the day shift. Kazensky didn't report any problems, apparently because Kazensky too was taking excessive breaks and engaging in some of the same misconduct.

Respondents argued to the board that if Kazensky was a "supervisor," then Mileur committed no misconduct because Kazensky permitted Mileur to engage in that conduct and therefore Mileur's conduct was "authorized." Perhaps this argument was the impetus for the personnel board's finding that Kazensky was not a supervisor. But a "supervisor" cannot authorize misconduct. A supervisor could not authorize the theft of city time any more than he or she could authorize the theft of city equipment or tools. If an employee expressed an admiration for an expensive set of city-owned tools, for example, a supervisor could not properly say, "Well then take them home, they're yours, a gift from the City." In sum, the city manager found that "Kazensky did not provide adequate supervision/lead responsibility." We do not see how a reasonable trier of fact could conclude otherwise.

The city argues that the court's finding No. 12 is not supported by the evidence. The court's finding No. 12 appears to us to be inconsequential. Respondents were not charged with conspiring to sabotage the swing shift or with "defying work assignments." They were charged with committing

various specified acts of misconduct. Not surprisingly, therefore, neither the personnel board nor the city manager made any finding as to whether respondents did or did not conspire to sabotage the swing shift, or whether respondents did or did not "defy work assignments." The city manager merely used the word "defiant" in a closing comment in his decision to terminate respondents. He stated "[t]he actions singularly and combined are defiant and retributive to management's expressed goals of efficiency and accountability." Whether respondents spent time "defiantly" doing no work or complacently doing no work is insignificant. Respondents were paid to do work. They spent large amounts of time not doing work, and got paid for that time.

As to the court's finding No. 13, neither the personnel board nor the city manager found Mileur "guilty of failure to maintain effective work management." It was undisputed, however, that Mileur had on one occasion incompetently performed work on a refuse vehicle so as to leave the vehicle with loose lug nuts. Mileur himself admitted this in his own testimony. The city manager's decision acknowledged this one incident of incompetence. The superior court's finding that Mileur "was not guilty of failure to . . . perform his job competently" was therefore not supported by the evidence. It was equally undisputed, however, that Mileur had worked for the city for eight years and that no other incident of incompetent repair work had been charged. Indeed, the city manager's decision expressly incorporated the personnel board's finding that all three of the terminated employees "possess a high level of expertise." Mileur's termination clearly was not the result of this single incident, however.

## II.

### Termination of Employment Was Not an Unlawful Penalty

■ The superior court agreed with respondents and concluded: "The termination of Mr. Kazensky and Mr. Mileur is excessive as a matter of law. Under the circumstances, the City was required to use progressive discipline, to advise, consult and admonish them, and give them an opportunity to correct their behavior." The city contends that the city manager's decision to terminate respondents can only be reversed if the city manager abused his discretion, and that the city manager did not abuse his discretion here. Respondents appear to agree that the city manager's decision can only be reversed for abuse of discretion. Respondents contend, however, that the city manager did abuse his discretion in this case because the city was required to use "progressive discipline" before it could terminate them. We agree with the city.

As we explained in our discussion of judicial review of administrative penalties, the penalty imposed by an administrative body will not be disturbed unless an abuse of discretion is demonstrated. (*Barber* v. *State Personnel Bd.*, *supra*, 18 Cal.3d at p. 404; *Lake* v. *Civil Service Commission*, *supra*, 47 Cal.App.3d at p. 228; *Schmitt* v. *City of Rialto*, *supra*, 164 Cal.App.3d at pp. 500-501; *Bailey* v. *City of National City*, *supra*, 226 Cal.App.3d at p. 1325, fn. 4; *Talmo* v. *Civil Service Com.*, *supra*, 231 Cal.App.3d at pp. 226-228; *West Valley-Mission Community College Dist.* v. *Concepcion*, *supra*, 16 Cal.App.4th at pp. 1778-1779; *California Real Estate Loans, Inc.* v. *Wallace*, *supra*, 18 Cal.App.4th at p. 1580; *Boctor* v. *Los Angeles County Metropolitan Transit Authority*, *supra*, 48 Cal.App.4th at pp. 574-575; Cal. Administrative Mandamus, *supra*, at §§ 4.87 & 14.26.) We would have no difficulty finding an abuse of discretion if there were a clear city policy calling for the application of progressive discipline (e.g., oral warning, written reprimand, suspension, and then termination) to this particular factual situation and the city had then failed to follow that policy. This is what respondents contend happened. We disagree. First of all, there was no written city policy on progressive discipline. Respondents offered into evidence an alleged written city policy on progressive discipline, but the personnel board refused to receive it. This was because of the undisputed testimony by the director of public works operations, Mr. Pinhey, that the alleged written policy offered by respondents was a document that was "no longer in effect or not a policy that is currently in effect with the City of Merced." Respondents do not contest the ruling on the inadmissibility of the out-of-date document, a document which Pinhey said "was suspended as of 1989 or thereabouts." Rather, respondents contend that Pinhey's own testimony established the existence of a progressive discipline policy applicable to respondents, and that the city failed to follow this unwritten policy. But Pinhey's testimony did not establish the existence of a progressive discipline policy that was necessarily applicable to the situation of these two respondents. On cross-examination, Pinhey testified as follows:

"ATTORNEY BONSALL: Is it fair to say that an effective, reasonable system of disciplinary actions is founded on the premise that actions are to be corrective rather than punitive and actions are progressively more severe as the actions fit the nature of the problem?

"MR. PINHEY: I think your key word is reasonable and, looking at what is reasonable and looking at basic values and looking at theft and falsification of documents, I found it reasonable to take the action.

"ATTORNEY BONSALL: And so you would agree with that statement?

". . . . . . . . . . . . . . . . . . . . . . . . .

"MR. PINHEY: I would agree with that statement but I will qualify it again.

"ATTORNEY BONSALL: With what is reasonable?

"MR. PINHEY: Yes.

"ATTORNEY BONSALL: Okay. Now, let me go on to one other thing. Would a typical sequence of disciplinary action include the following: counseling, oral warning, written notice of reprimand, suspension, and dismissal?

"MR. PINHEY: Depending on the nature of the violation, you could define a progressive disciplinary action as taking the steps that you just read off.

"ATTORNEY BONSALL: And isn't it the policy of the City that discipline should be progressive in a constructive attempt to correct the behavior of an employee?

"MR. PINHEY: It is the policy when it is feasible."

In the present case the city was reasonably attempting to discover the cause or causes of vandalism to city vehicles. There was no dispute that the vandalism was occurring. Respondents themselves so testified. Had the city confronted respondents after the first week of videotaping and told them they were taking excessive breaks, Pinhey or Morgan would have had some difficulty explaining how they knew respondents were taking excessive breaks. Pinhey and Morgan were not present during the hours of the swing shift, except for Morgan's presence during the first hour or two each day. Had Pinhey or Morgan done this, the swing shift employees might have realized that they were being watched. Although this might have reduced the amount of break time, it also would likely have defeated the purpose of the videotaping. In other words, if city employees had been responsible for the vandalism, they would not have been likely to continue vandalizing if they knew or believed they were being watched. Judicial interference with an agency's choice of a penalty "will only be sanctioned when there is an arbitrary, capricious or patently abusive exercise of discretion by the administrative agency." (*Lake* v. *Civil Service Commission, supra,* 47 Cal.App.3d at p. 228.) We cannot find here a patently abusive exercise of discretion. Pinhey was asked: "You chose termination. Can you tell us why termination and not some lesser penalty?" He answered:

"MR. PINHEY: Well, first of all, I want to make it pretty basic again. In reviewing this, the basic problem here is theft and falsification of documents. And, furthermore, in looking at that I said, well, is this an isolated incident or a momentary thing? And I found that it was an extended pattern

of behavior over the four weeks or so of taping. I looked at that and I said this is a pattern of behavior. To me, it indicates a conscious, deliberate decision to steal and falsify documents. Furthermore, I look at that and I say, theft, that's it. I mean, there's really no second chance, so what are you going to do to correct that type of behavior. You can no longer trust somebody who is engaging in that type of activity. That was my thought process and upholding the recommendation to terminate these employees."

This court has also stated: "One of the tests . . . for determining whether the administrative body acted within the area of its discretion is whether reasonable minds may differ as to the propriety of the penalty imposed. The fact that reasonable minds may differ will fortify the conclusion that there was no abuse of discretion." (*Lake* v. *Civil Service Commission, supra*, 47 Cal.App.3d at p. 228.) In the present case, Morgan recommended termination of both respondents. Pinhey agreed. After a personnel board hearing spanning portions of several days, the board voted five to zero to recommend termination of Mileur and voted three to two for reinstatement of Kazensky with a two-step demotion and no backpay. The two board members who did not side with the majority vote on Kazensky voted to recommend termination of Kazensky. The city manager then decided to terminate both respondents. This is a total of eight individuals who made recommendations or decisions as to an appropriate penalty. Of these eight, all eight viewed termination as appropriate for Mileur. Five of the eight viewed termination as appropriate for Kazensky. Even if one were to disregard the recommendations or decisions made by Morgan and Pinhey before the personnel board hearing took place, this is still six of six viewing termination as appropriate for Mileur and three of six viewing termination as appropriate for Kazensky. "In reviewing the penalty imposed by an administrative body, which is duly constituted to announce and enforce such penalties, neither a trial court nor an appellate court is free to substitute its own discretion as to the matter nor can the reviewing court interfere with the imposition of a penalty by an administrative tribunal because in the court's own evaluation of the circumstances the penalty appears to be too harsh." (*Lake, supra*, 47 Cal.App.3d at p. 228.) On October 7 alone Mileur left work two hours and thirty-three minutes early but reported on his time card that he worked a full day. There was testimony that on the last day of a pay period the established procedure was for swing shift employees to turn in their time sheets early in the shift, apparently for bookkeeping purposes. Morgan referred to these days as "honor" Fridays and explained that October 7 was one of those "honor" Fridays. Even if the court, in its weighing of the evidence, believed Mileur's testimony that he left two hours and thirty-three minutes early because he was ill, it was still undisputed that Mileur got paid for a full eight-hour shift and that he never took any steps to either correct the information he had

reported or to compensate for the fact that he had been paid for a full shift even though he had left early. We think a reasonable manager could view this incident of dishonesty, by itself, as warranting termination. Similarly, on September 15 Mileur left early and then Kazensky "punched out" for Mileur at the end of the shift. Aside from the fact that Kazensky violated a city policy prohibiting one employee from punching out for another, this too was a dishonest act. This dishonesty, combined with the fact that Kazensky was in charge of a swing shift whose three members (including himself) spent a great deal of time doing nothing, justified the city's decision to terminate him.

Respondents cite no authority requiring "progressive discipline" in any particular type of case. The authority is to the contrary. "The question whether progressive discipline was appropriate . . . was a matter within the [agency's] discretion." (*Talmo* v. *Civil Service Com.*, *supra*, 231 Cal.App.3d at p. 230.) Respondents rely on *Skelly* v. *State Personnel Bd.*, *supra*, 15 Cal.3d 194, and *Blake* v. *State Personnel Board* (1972) 25 Cal.App.3d 541 [102 Cal.Rptr. 50]. These cases are distinguishable. In *Skelly* a 64-year-old medical doctor employed by the state was terminated "based upon the doctor's conduct in extending his lunch break beyond his allotted one hour on numerous occasions, generally by five to fifteen minutes, and in twice leaving the office for several hours without permission." (15 Cal.3d at p. 218.) There was also "undisputed evidence," however, that the doctor "more than made up for the excess lunch time by working through coffee breaks as well as on some evenings and holidays." (*Ibid.*) Other witnesses at the doctor's hearing "confirmed [the doctor's] testimony that he rarely took coffee breaks" and "described him as efficient, productive and extremely helpful and cooperative . . . ." (15 Cal.3d at p. 199.) The doctor in *Skelly* was terminated after a superior came to the doctor's office one afternoon and the doctor was not there. (15 Cal.3d at p. 198.) In the present case, however, there was no evidence that respondents worked on weekends or otherwise made up for the time they spent taking breaks. In *Skelly* the court cited "the overriding concern for averting harm to the public service" as a factor in concluding that the board abused its discretion in upholding the dismissal. (15 Cal.3d at p. 219.) Another doctor described Dr. Skelly as " 'our right hand man as far as information concerning ear, nose and throat problems not only for the District Office but for the Region as well.' " (15 Cal.3d at p. 199.) In the present case, it was precisely the concern for averting harm to the public service which led to the decision to dismiss respondents. The city manager concluded that the city had an obligation to obtain work from its mechanics for the salaries the city was paying them.

*Blake* is similarly distinguishable. It involved a supervising deputy labor commissioner of the Division of Labor Law Enforcement who displayed a

gun while out of town at a State Bar convention. The misconduct was "discourteous treatment of other employees" who were at the convention, and the misconduct occurred "outside of duty hours." (*Blake, supra,* 25 Cal.App.3d at p. 550.) In the present case, respondents' misconduct occurred during duty hours and consisted largely of not doing work during those duty hours.

Respondents' cursory and conclusory argument that the city manager abused his discretion because two other employees took extended breaks and were not terminated is meritless. A third employee who took extensive breaks along with Kazensky and Mileur *was* terminated. The two employees about whom respondents appear to be referring were Messrs. Johnson and Harris. Johnson did not start working on the swing shift until October 3. He was filmed on six dates in October before the taping ended. His total break times on those dates, according the evidence respondents themselves presented to the personnel board, were 68, 28, 27, 36, 63 and 50 minutes. Thus, of the 360 minutes of break time to which Mr. Johnson was entitled in that 6-day span, he took only 272 minutes of it. The city could reasonably have viewed Mr. Johnson as a good and trustworthy employee rather than as someone deserving of termination. Harris was a custodian, but not the one who let Mileur into Morgan's office. He was not assigned to the shop area where respondents worked but rather to other nearby buildings. The tapes showed that he appeared to spend break time at the shop. He was filmed on 12 dates. On none of those dates did his total filmed break time exceed 55 minutes and on only 2 occasions did it exceed 38 minutes.

### III.

### *The Employees' Cross-appeal*

The employees' contention that they were entitled to a superior court order awarding them backpay is without merit because, as we have explained, they were properly terminated. Similarly, their contention that they were entitled to an award of attorney fees under Government Code section 800 is without merit because that section authorizes an award of attorney fees only "where it is shown that the award, finding, or other determination of the proceeding was the result of arbitrary or capricious action or conduct by a public entity or an officer thereof in his or her official capacity. . . ." The city manager's decision was not an arbitrary or capricious action. It was, as we have explained, a proper exercise of his discretion.

### DISPOSITION

The judgment of the superior court is reversed. The case is remanded to the superior court, and the superior court is directed to deny respondents'

petition for writ of administrative mandamus and to enter judgment in favor of the city. Costs on appeal are awarded to the city.

Vartabedian, J., and Levy, J., concurred.