Filed 12/19/13  Hinderliter v. City of La Habra CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MARTY HINDERLITER, | |
| Plaintiff and Respondent, | G048025 |
| v. | (Super. Ct. No. 30-2012-00536026) |
| CITY OF LA HABRA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Gregory H. Lewis, Judge.  Reversed.

Liebert Cassidy Whitmore, J. Scott Tiedemann and Alex Y. Wong for Defendant and Appellant.

Law Offices of Michael A. Morguess, Michael A. Morguess; Lackie, Dammeier & McGill and Michael A. McGill for Plaintiff and Respondent.

\*          \*          \*

Defendant and appellant City of La Habra (City) appeals from the trial court's judgment directing the City to set aside its decision terminating plaintiff and respondent Marty Hinderliter's employment as an officer with the City's police department. After conducting an investigation, the City found Hinderliter engaged in several acts of misconduct that violated the City's policy manual, including repeatedly lying to a superior officer regarding an extramarital affair Hinderliter had with a supervisor's wife. The City determined termination was the appropriate discipline because lying to a superior officer undermines an officer's ability to serve the public.

The trial court found the weight of the evidence supported the City's conclusion Hinderliter repeatedly lied to a superior officer, but also found the City abused its discretion in terminating Hinderliter's employment based on the lies. According to the trial court, Hinderliter's falsehoods had a limited effect on his job performance because he told the lies during informal conversations with a superior officer who was not directly involved in the investigation of Hinderliter's alleged misconduct.

We reverse. Although we conclude substantial evidence supports the trial court's finding Hinderliter repeatedly lied to a superior officer, we also conclude the trial court erred in finding the City abused its discretion by terminating Hinderliter. As we explain below, honesty and credibility are essential to a police officer's ability to effectively serve the public and the appropriate punishment for an officer's dishonest conduct affecting his or her ability to perform essential job functions is vested in the public employer's discretion. The trial court improperly substituted its discretion for the City's in determining the appropriate discipline for Hinderliter's lies. Because we conclude the City properly exercised its discretion in terminating Hinderliter based on his falsehoods, we do not address whether Hinderliter's other instances of misconduct also supported his termination.

2

# I

## FACTS AND PROCEDURAL HISTORY

Hinderliter was a sworn police officer with the City's police department. In 2009, he had an extramarital affair with the wife of one of his supervisors and a separate affair with a married coworker. During an off duty social event, Hinderliter disclosed explicit details of these affairs to two other officers and showed them photographs and text messages to corroborate his claim. Rumors about the affairs soon began circulating around the police department and subjected Hinderliter to significant ridicule.

When Hinderliter first heard the rumors, he phoned another of his supervisors, Sergeant James Tigner, who was off duty at the time. Hinderliter told Tigner rumors about him having an affair with his supervisor's wife had begun to circulate and he wanted Tigner to hear about the rumors from him. Hinderliter assured Tigner the rumors were not true. Tigner told Hinderliter he appreciated the phone call and not to let the rumors distract Hinderliter from doing his job. Tigner also told Hinderliter that if anything like that did happen he should be honest with Tigner about it.

A few days later, Hinderliter again broached the subject with Tigner. Hinderliter acknowledged the rumors continued to circulate, but again claimed they were not true. Hinderliter informed Tigner he had text messages from his supervisor's wife showing she was pursuing him, but he rejected her advances. Tigner later had a third conversation with Hinderliter in the police department parking lot during which Hinderliter again denied the rumors.

When Hinderliter's supervisor learned Hinderliter had an affair with his wife and told other officers about it, he complained to the police department's professional standards unit. Based on that complaint, the department investigated the allegations. Hinderliter admitted to investigators he had an affair with his supervisor's wife. The investigators concluded Hinderliter violated the department's policy manual

3

and code of ethics, and recommended the police chief suspend Hinderliter. After reviewing the investigators' report, the police chief agreed and suspended Hinderliter without pay for 60 hours during January 2010. Hinderliter did not appeal and served his suspension without objection.

On his first day back after the suspension, the police chief met with Hinderliter and warned him not to engage in conduct that could be perceived as unprofessional, offensive, intimidating, or threatening. During the meeting, Hinderliter complained someone had left a computer printout in his department mailbox that defined the word psychopath. The chief took the printout from Hinderliter and assured him the department would look into it. Shortly after the meeting, Hinderliter send a text message to an officer he thought may have left the printout in his mailbox. The text message stated, "'The Wikipedia page that was put in my box is appreciated. It was passed on to the chief, just so you know. Feel free to let whoever else need [sic] to know.'"

On his second day back, Hinderliter attended a department-wide meeting. To exit the room after the meeting Hinderliter walked by Officer Nick Wilson, who was one of the officers that reported Hinderliter's admissions he had an extramarital affair with his supervisor's wife. As Hinderliter walked by Wilson, he passed very close to Wilson's face. According to Wilson, Hinderliter attempted to intimidate him by making a throat clearing sound that suggested he was about to spit on Wilson, who was shocked by Hinderliter's conduct. No one else, however, heard Hinderliter make any sound. Hinderliter initially told two superior officers that he unintentionally cleared his throat as he passed Wilson. After learning no one heard him make a sound, Hinderliter told another superior officer he was "99% sure" he did not make any sound.

Following this incident, the police chief authorized an investigation into the circumstances of Hinderliter's text message to the officer he believed left the document in his mailbox and his encounter with Wilson. During this investigation, Tigner also asked the investigators to consider whether Hinderliter lied to him when he denied having

4

an affair with his supervisor's wife. As a supervisor, Tigner explained he had serious concerns about Hinderliter's credibility and whether he could trust Hinderliter because Hinderliter repeatedly had told him the rumors about the affair were untrue, but later admitted to the affair.

Based on the investigation, the police chief notified Hinderliter that he intended to terminate Hinderliter's employment. The chief found that Hinderliter (1) engaged in insubordination by sending a text message to the officer he suspected of placing the computer printout in his mailbox despite the City's warning not to engage in any conduct that could be perceived as unprofessional, offensive, intimidating, or threatening; (2) engaged in insubordination by making a sound in Wilson's ear designed to intimidate him one day after the chief instructed Hinderliter not to engage in intimidating conduct; (3) engaged in conduct unbecoming an officer and contrary to good order by attempting to intimidate Wilson; (4) lied to his supervisor by repeatedly telling Tigner the rumors about the affair were untrue; and (5) misrepresented material facts relevant to the investigation regarding his encounter with Wilson and his statements to Tigner. The chief further concluded that each individual instance of misconduct warranted termination.

Hinderliter appealed the chief's decision to the City's personnel commission, which conducted a seven-day hearing at which Hinderliter was allowed to cross-examine the police department's witnesses and call his own witnesses. In October 2011, the commission issued its "Findings, Determination, and Recommendation" upholding the chief's decision to terminate Hinderliter. Based on the testimony and other evidence the commission received, it concluded Hinderliter committed the misconduct the chief had identified and that each instance individually warranted termination except Hinderliter's encounter with Wilson. The City's manager agreed, and as the City's final decision maker adopted the commission's findings and determination as his own and terminated Hinderliter's employment.

5

In January 2012, Hinderliter filed a petition for writ of administrative mandamus seeking to overturn the City's decision.  Hinderliter argued the evidence did not support a finding that he engaged in the alleged misconduct and that any misconduct in which he engaged did not warrant termination.  The trial court granted Hinderliter's petition, set aside the City's decision terminating his employment, and ordered the City to reconsider its actions against Hinderliter.

In its ruling, the trial court found the weight of the evidence did not support the City's finding that Hinderliter engaged in insubordination by sending the text message because the City "failed to present any evidence, demonstrating the subject text message was 'offensive, intimidating, or threatening,' such that it could be considered a violation of [the] Chief['s] order."  Similarly, although the evidence showed Hinderliter passed close to Wilson, the trial court found "the evidence does not support a finding that [Hinderliter] was attempting to intimidate Officer Wilson."  As for the dishonesty charges, the trial court found the City "failed to present any evidence" Hinderliter's statements about his encounter with Wilson "were intentional misrepresentations," but "the weight of the evidence supports a finding that [Hinderliter] lied to Sergeant Tigner." Nonetheless, the court concluded the City abused its discretion in terminating Hinderliter based solely on his lies to Tigner.  According to the court, "there is no indication [Hinderliter's lies to Tigner] resulted in 'harm to the public service' . . . [because they] were made during informal conversations unrelated to the official investigation" and therefore "the effect of the misrepresentations [was] limited."  Finally, the court found the City "failed to provide any evidence that this conduct was likely to recur."

Neither the City nor Hinderliter asked the trial court for a statement of decision explaining the factual and legal basis for its ruling.  Accordingly, the trial court entered judgment against the City based solely on the ruling it issued at the hearing on Hinderliter's writ petition.  The City timely appealed.

6

II

DISCUSSION

A.  *The Trial Court Properly Found Hinderliter Lied to a Superior Officer*

1.  Standard of Review and the Doctrine of Implied Findings

The appropriate standard of review in an administrative mandamus proceeding depends on the nature of the right at issue.  (*Flippin v. Los Angeles City Bd. of Civil Service Commissioners* (2007) 148 Cal.App.4th 272, 279 (*Flippin*).)  If a fundamental vested right is involved, the trial court reviews the administrative decision under the independent judgment standard.  (*Ibid*.)  If no such right is involved, the trial court applies the substantial evidence standard of review.  (*Antelope Valley Press v. Poizner* (2008) 162 Cal.App.4th 839, 850.)

A police officer's or other public employee's right to continued employment is a fundamental vested right requiring the trial court to exercise its independent judgment to determine whether the weight of the evidence supports the administrative agency's factual findings.  (*Flippin*, *supra*, 148 Cal.App.4th at p. 279; see *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 808 (*Fukuda*).)  "In exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence."  (*Fukuda*, at p. 817.)  "Because the trial court ultimately must exercise its own independent judgment, that court is free to substitute its own findings after first giving due respect to the agency's findings."  (*Id*. at p. 818.)

"An appellate court must sustain the trial court's factual findings if substantial evidence supports them, resolving all conflicts in favor of the prevailing party, and giving that party the benefit of every reasonable inference in support of the judgment."  (*Flippin*, *supra*, 148 Cal.App.4th at p. 279; *Fukuda*, *supra*, 20 Cal.4th at

7

p. 824 ["Even when, as here, the trial court is required to review an administrative decision under the independent judgment standard of review, the standard of review on appeal of the trial court's determination is the substantial evidence test"].)

Any party in an administrative mandamus proceeding may request the trial court issue a statement of decision explaining the factual and legal basis for its decision. (Code Civ. Proc., § 632; *Kazensky v. City of Merced* (1998) 65 Cal.App.4th 44, 67 (*Kazensky*) ["'It is . . . well established that Code of Civil Procedure section 632 applies to administrative mandamus proceedings in which the trial court exercises its independent judgment in reviewing the record'"]; *Giuffre v. Sparks* (1999) 76 Cal.App.4th 1322, 1326.)

Here, both the City and Hinderliter waived the right to have the trial court provide factual findings and legal conclusions explaining its decision because neither requested a statement of decision. (*Hall v. Bureau of Employment Agencies* (1976) 64 Cal.App.3d 482, 496 (*Hall*).) We therefore must presume the trial court made all factual findings necessary to support its judgment and we review the record solely to determine whether substantial evidence supports those implied findings. (Code Civ. Proc., § 634; *Gately v. Cloverdale Unified School Dist.* (2007) 156 Cal.App.4th 487, 496; *Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 59-60.) Indeed, when the parties waive a statement of decision in an administrative mandamus proceeding, "'[i]t must be conclusively presumed . . . that the trial court weighed the evidence giving due weight to the presumption in favor of the board's findings'" and we must affirm the lower court's decision if it is supported by substantial evidence in the record. (*Fukuda*, *supra*, 20 Cal.4th at p. 812, italics omitted, quoting *Drummey v. State Bd. of Funeral Directors* (1939) 13 Cal.2d 75, 86.)

8

2.    Substantial Evidence Supports the Trial Court's Finding Hinderliter Lied to Tigner

Although the trial court found the City's findings that Hinderliter was insubordinate, acted to intimidate Wilson, and misrepresented facts to the investigators were not supported by the weight of the evidence, the court also concluded the weight of the evidence supported the City's finding that Hinderliter repeatedly lied to Tigner about the extramarital affair. Hinderliter did not cross-appeal to challenge the finding he repeatedly lied to Tigner and therefore may not raise the matter on appeal. (*Adoption of H.R.* (2012) 205 Cal.App.4th 455, 466 ["'It is a general rule a respondent who has not appealed from the judgment may not urge error on appeal'"].) Even if Hinderliter preserved this issue for appeal, the court's finding is supported by substantial evidence.

Under the substantial evidence standard of review, "the power of the appellate court begins and ends with the determination as to whether on the entire record, there is substantial evidence contradicted or uncontradicted that supports the finding. . . . [S]ubstantial evidence . . . is evidence of ponderable legal significance that is reasonable, credible and of solid value, supporting the challenged findings of the trier of fact." (*Quigley v. McClellan* (2013) 214 Cal.App.4th 1276, 1282-1283.) "'So long as there is "substantial evidence," the appellate court *must affirm* . . . even if the reviewing justices personally would have ruled differently had they presided over the proceedings below, and even if other substantial evidence would have supported a different result. Stated another way, when there is substantial evidence in support of the trial court's decision, the reviewing court has *no power to substitute its deductions*. [Citations.]' [Citation.]" (*Rupf v. Yan* (2000) 85 Cal.App.4th 411, 429-430, fn. 5, original italics (*Rupf*).)

Here, Tigner testified Hinderliter called him on his day off to let Tigner know rumors had started to circulate around the police department that Hinderliter had an extramarital affair with his supervisor's wife and Hinderliter wanted Tigner to hear from him that the rumors were not true. Tigner also testified about two additional

9

conversations he had with Hinderliter in which Hinderliter told him the rumors about the affair were not true. The record shows that Hinderliter later admitted he had an affair with his supervisor's wife and the department disciplined him for disclosing that information and creating a difficult work environment. This constitutes substantial evidence supporting the conclusion Hinderliter lied to Tigner.

Hinderliter argues the trial court erred because "substantial evidence supports that [Hinderliter] was not dishonest with Sergeant Tigner." (Initial capitalization omitted.) That argument, however, turns the standard of review on its head. The question is not whether substantial evidence would support a contrary finding, but whether substantial evidence supports the trial court's specific finding. (*Rupf*, *supra*, 85 Cal.App.4th at pp. 429-430, fn. 5.) As explained above, substantial evidence supports the trial court's finding Hinderliter lied to Tigner.

Hinderliter also argues there is a lack of substantial evidence because the City's personnel commission found "Tigner could not even recall what [Hinderliter] said to him about his work-place romance." Hinderliter mischaracterizes the commission's findings. Contrary to his claim, the commission found Tigner could not recall the precise words Hinderliter used in denying he had the affair, but Tigner clearly testified Hinderliter denied having the affair. The transcript of Tigner's testimony before the commission supports that finding.

Moreover, during the administrative process, the police department investigators interviewed Tigner a second time after Hinderliter argued he simply told Tigner "'not all the rumors are true.'" During this second interview, investigators asked Tigner if he had any doubt Hinderliter lied to him about the affair and Tigner responded, "No, there is no doubt in my mind." Indeed, Tigner remained consistent and emphatic in his testimony throughout both interviews and his testimony before the City's personnel commission that Hinderliter lied to him about the affair. In contrast, Hinderliter testified he could not recall whether he specifically told Tigner he did not have the affair and

10

simply remembered saying, "'not all the rumors are true.'" We cannot overturn the trial court's finding on this record.

Regarding the trial court's conclusion the weight of the evidence did not support the City's findings that Hinderliter committed insubordination, sought to intimidate Wilson, and misrepresented facts to the investigators, the City argues the trial court erred by failing to afford the City's findings the presumption of correctness under the independent judgment standard of review. The City, however, waived this argument by failing to request a statement of decision and we must presume the trial court exercised the appropriate deference to the City's findings. (*Hall*, *supra*, 64 Cal.App.3d at p. 496.) Accordingly, the only issue presented regarding these findings is whether they were supported by substantial evidence. (*Fukuda*, *supra*, 20 Cal.4th at p. 812.) But we do not decide that issue because, as explained below, we conclude the City's and the trial court's findings that Hinderliter lied to Tigner are sufficient to support the City's decision to terminate Hinderliter's employment.

B.      *The City Properly Exercised Its Decision to Terminate Hinderliter*

1.      Standard of Review

"'It is well settled that the propriety of a penalty imposed by an administrative agency is a matter resting in the sound discretion of the agency . . . .' [Citation.]" (*Pegues v. Civil Service Com.* (1998) 67 Cal.App.4th 95, 106 (*Pegues*).) "'In reviewing the exercise of this discretion we bear in mind the principle "[c]ourts should let administrative boards and officers work out their problems with as little judicial interference as possible. . . ." [Citations.]' [Citation.]" (*Landau v. Superior Court* (1998) 81 Cal.App.4th 191, 218 (*Landau*).)

"Judicial review of an agency's assessment of a penalty is limited, and the agency's determination will not be disturbed in mandamus proceedings unless there is an arbitrary, capricious or patently abusive exercise of discretion by the agency. . . . An

11

appellate court conducts a de novo review of the trial court's determination of the penalty assessed, giving no deference to the trial court's determination. [Citation.]" (*Flippin*, *supra*, 148 Cal.App.4th at p. 279; see *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 217-218 (*Skelly*); *Landau*, *supra*, 81 Cal.App.4th at pp. 217-218.)

"In considering whether such abuse occurred in the context of public employee discipline, we note that the overriding consideration in these cases is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, '[h]arm to the public service.' [Citations.] Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence." (*Skelly*, *supra*, 15 Cal.3d at p. 218.)

"'In reviewing the penalty imposed by an administrative body, which is duly constituted to announce and enforce such penalties, neither a trial court nor an appellate court is free to substitute its own discretion as to the matter nor can the reviewing court interfere with the imposition of a penalty by an administrative tribunal because in the court's own evaluation of the circumstances the penalty appears to be too harsh.' [Citation.]" (*Kazensky*, *supra*, 65 Cal.App.4th at p. 75; see *Pegues*, *supra*, 67 Cal.App.4th at pp. 106-107.) "If reasonable minds may differ with regard to the propriety of the disciplinary action, no abuse of discretion has occurred." (*Flippin*, *supra*, 148 Cal.App.4th at p. 279.)

> 2. The Trial Court Improperly Substituted Its Judgment for the City's in Finding Termination Was an Excessive Penalty

In deciding to terminate Hinderliter's employment, the City made the following finding regarding his lies to Tigner: "We are particularly troubled by this Charge, which we view as both overwhelmingly supported by the evidence and perhaps the most serious violation charged. Lying to a superior officer concerning a matter clearly related to department business cannot be tolerated. When a supervisor can no longer count on the unmitigated honesty of his subordinates, the entire department is

12

undermined, and the officer cannot be trusted in the field, in the police station, or in court. We find this charge sufficient in and of itself to warrant termination."

The trial court found the City abused its discretion in terminating Hinderliter because his lies occurred during informal conversations unrelated to an ongoing investigation and his falsehoods did not "result[] in 'harm to the public service.'" Based on Tigner's testimony that his conversations with Hinderliter were "'Marty and Jim moments' that were not 'Sergeant to Officer'" and Tigner's noninvolvement in the investigation into the circumstances of Hinderliter's extramarital affair, the trial court concluded "the effect of the misrepresentations were limited" and did not "rise to the level of 'dishonesty in [a] matter of public trust.'" We conclude the trial court erred because it reweighed the evidence on the importance of honesty in a police officer's ability to effectively perform his public function and improperly substituted its judgment for that of the City.

"'There are certain professions which impose upon persons attracted to them, responsibilities and limitations on freedom of action which do not exist in regard to other callings. Public officials such as judges, policemen and schoolteachers fall into such a category. . . .' [Citation.]" (*San Diego Unified School Dist. v. Commission on Professional Competence* (2011) 194 Cal.App.4th 1454, 1463-1464; see *Ackerman v. State Personnel Bd.* (1983) 145 Cal.App.3d 395, 400 (*Ackerman*).) "'A [police officer's] job is a position of trust and the public has a right to the highest standard of behavior from those they invest with the power and authority of a law enforcement officer. Honesty, credibility and temperament are crucial to the proper performance of an officer's duties. Dishonesty is incompatible with the public trust.' [Citation.]" (*Kolender v. San Diego County Civil Service Com.* (2005) 132 Cal.App.4th 716, 721 (*Kolender*); *Ackerman*, at pp. 399-400.)

Even an isolated incident of dishonesty is sufficient grounds for terminating a police officer because "'honesty is not considered an isolated or transient behavioral

13

act; it is more of a continuing trait of character.' [Citation.]" (*Ackerman*, *supra*, 145 Cal.App.3d at p. 399; *Nicolini v. County of Tuolumne* (1987) 190 Cal.App.3d 619, 629 (*Nicolini*); see *Kolender*, *supra*, 132 Cal.App.4th at p. 721.) As law enforcement agencies charged with the public safety and welfare, police departments "'must be above reproach'" and they must hold their officers to the highest standards. (*Ackerman*, at pp. 399-400.) "'Any breach of trust must therefore be looked upon with deep concern.'" (*Id.* at p. 400.)

Echoing these same principles, Tigner's testimony before the City's personnel commission explained the significant impact Hinderliter's lies had on him as one of Hinderliter's supervisors: "Integrity and your word is everything in this line of work. It is the forefront of what we do. When you stand there and take an oath to tell the truth, you're expected to do that, just like I took the oath right here and I've taken it in court. Integrity is everything. [¶] So when I find out that a person that I was fairly close to was dishonest with me about this thing, this incident, I have serious concerns about his credibility, his word to me. As a police officer and sergeant supervisor in the field, that's very difficult if not impossible for me to work with out there. [¶] . . . [¶] I have to know the honest truth as to what is happening out in the field so I can do my job as a supervisor. I can't do my job effectively as a supervisor if my people are being less than truthful, or if they're outright lying to me, or if there's a suspicion of that in the back of my mind, especially in critical incidents."

Hinderliter's lies therefore harmed the public service by undermining his ability to effectively serve the public as a police officer. Indeed, not only did Hinderliter lose his credibility and reliability among his supervisors and fellow officers, he also likely lost his ability to perform an essential job function—testifying in court. Once the City determined Hinderliter was subject to discipline for lying to a superior officer, that information became part of his personnel file potentially subject to discovery by a defendant in any criminal proceeding in which Hinderliter was a material witness. (See

14

Evid. Code, §§ 1043-1045.) Accordingly, terminating Hinderliter was within the scope of the City's discretion in disciplining him for lying to a superior officer. (See, e.g., *Kolender*, *supra*, 132 Cal.App.4th at p. 721 [police officer properly subject to termination for lying about another officer abusing inmate]; *Nicolini*, *supra*, 190 Cal.App.3d at pp. 624, 628-629 [police officer properly subject to termination for altering prescription and attempting to fill it while in uniform]; *Ackerman*, *supra*, 145 Cal.App.3d at pp. 398-400 [police officer properly subject to termination for acquiring state-owned motorcycle parts for his personal use through misrepresentations and then lying about the events]; see also *Pegues*, *supra*, 67 Cal.App.4th at pp. 107-108 [upholding termination of public employee for misrepresentations on application for public assistance].)

Contrary to the trial court's conclusion, Hinderliter's lies were not mitigated or rendered inconsequential because of the purported informal nature of Hinderliter's conversations with Tigner and Tigner's noninvolvement in the investigation of Hinderliter's extramarital affair. The record reveals that Hinderliter purposely sought out Tigner while he was off duty to talk about the impact of the rumors at work. During that and other conversations Hinderliter repeatedly lied to Tigner, telling him the rumors were not true. Regardless of whether these conversations were informal and whether Tigner was involved in the investigation, Hinderliter's lies to his supervisor necessarily impacted the work relationship between the two men and Tigner's ability to trust Hinderliter's police work.

Moreover, the police chief's notice of final determination terminating Hinderliter's employment specifically rejected the suggestion that the conversations between Hinderliter and Tigner were merely informal conversations between friends that had no connection with department business. Specifically, by seeking out Tigner to tell him the rumors about the extramarital affair were not true before Tigner had even heard the rumors, the chief found Hinderliter "[was] engaging in 'damage control' and [was] making an effort to keep Sergeant Tigner 'in [his] camp' as this matter progressed."

15

Finally, the trial court found Hinderliter's termination was not warranted because his conduct did not rise to the level of misconduct justifying the terminations of officers upheld in *Ackerman* and *Nicolini*. Those cases, however, did not establish a minimum threshold of police officer dishonesty before the officer properly may be terminated. Rather, *Ackerman* and *Nicolini* merely articulated the controlling principles regarding the damaging impact dishonest conduct has on a police officer's ability to perform his or her job and then applied those principles to the facts presented.

Here, the City properly considered Hinderliter's lies and determined they warranted terminating his employment because they significantly impacted his ability to effectively serve the public as a police officer. The foregoing authorities demonstrate that determination was within the City's discretion and we cannot find any support in the record for the trial court's conclusion the City's determination "appears to be beyond the bounds of reason." Accordingly, we reverse the trial court's decision because it improperly substituted its discretion for the City's on the appropriate punishment.

III

DISPOSITION

The judgment is reversed. The City shall recover its costs on appeal.


ARONSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.


16