Filed 2/27/15  Lemm-Harris v. City of Baldwin Park CA2/2CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| WENDY LEMM-HARRIS, | B253071 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS138627) |
| v. | |
| CITY OF BALDWIN PARK et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Luis A. Lavin, Judge.  Affirmed.

Silver, Hadden, Silver & Levine, Ken Yuwiler for Plaintiff and Appellant.

Liebert Cassidy Whitmore, Pilar Morin, Danny Y. Yoo for Defendants and Respondents.

_____

Appellant contends that the trial court erred in deciding her petition for writ of mandate by failing to review the entire administrative record. Appellant also contends that the trial court's findings were not supported by substantial evidence. We affirm the judgment.

## Factual and Procedural Background

Appellant Wendy Lemm-Harris began working for real party in interest the City of Baldwin Park[1] in 1989 (the City), in the department of public works. She became public works supervisor in 1995 and was reclassified as public works operations supervisor in 2004. Harris received performance evaluations throughout her career. The last one, issued in September 2006, was positive.

As public works operations supervisor, Harris's duties included planning, organizing, and directing the activities of the street maintenance and landscape maintenance divisions of the public works department. She reported directly to the director of public works, who, beginning in November 2006, was William Galvez.

In April 2008, following an incident at a City park involving yelling, swearing, and the possible use of racial slurs among public works employees, Harris knew that an internal investigation was likely to occur. Although Harris was not involved in the incident, she later became a subject of the investigation. In June 2008, the City's human resources manager sent her a memorandum entitled "admonishment against retaliatory conduct." The admonishment memorandum stated: "As you are aware the City has recently received allegations of discrimination and harassment against you. . . . [W]e have commenced an administrative investigation to look into the alleged discrimination and harassment complaints." The memorandum ordered Harris to cooperate with the investigation and prohibited her from contacting any coworker or witness who she believed may be associated with the investigation to discuss it. Harris was warned that

---

[1] The City of Baldwin Park Personnel Commission is named as the respondent in this matter. At times in this opinion, both the City and the Personnel Commission are referred to generally to as the City.

2

any attempt to "improperly influence, intimidate, harass, or retaliate against any individual you believe has cooperated, or may cooperate, in the investigation" could result in dismissal.

Harris was interviewed for the investigation on July 24, 2008. That same day, her supervisor, Galvez, issued a notice of administrative leave with pay, relieving her of all duties and responsibilities as the public works operations supervisor. In November 2008, Galvez sent to Harris a notice of intent to terminate, wherein he informed her of his recommendation to terminate her employment. The notice listed 10 general areas of misconduct allegedly committed by Harris.

Following a *Skelly*[2] meeting held in December 2008, Harris was terminated by the City in February 2009. The City's notice of termination laid out allegations underlying six different bases for termination: (1) "dishonesty, inefficiency, neglect of duty, discourtesy to fellow employees and other acts incompatible with service to the public" in connection with an incident referred to as "the Carrizales grievance," where Harris had her subordinate, William Floate, write up a maintenance worker, David Carrizales, for taking a day off; (2) "failure to address the impact of lack of punctuality, alcohol use, tardiness and late work assignments by senior maintenance worker Steve Couchman"; (3) disparate treatment of employees who arrived more than 15 minutes late to work; (4) "insubordination and threatening behavior," including an incident in July 2008 where Harris burst into Galvez's office and demanded information on the ongoing investigation, as well as allegedly making threats of retaliation against anyone who participated in the investigation; (5) "additional acts which are incompatible with service to the public," referring to an incident where Harris allegedly gave an employee, Michael Laidlaw, unclear instructions to pick up signs on public property and then swore at Laidlaw after Harris received an irate call from a real estate developer; and (6) "further discourtesy to the public or fellow employees," including swearing at employees and making other inappropriate comments.

---

[2]     *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194.

3

Harris thereafter appealed her termination to an "arbiter"[3] chosen by the parties. The appeal hearing lasted 16 days and spanned several years. Fourteen witnesses testified.

The six bases for termination outlined in the City's notice of termination made up the six charges leveled against Harris in the appeal hearing. In March 2012, the arbiter issued a 46-page "arbiter's opinion and advisory award," finding that the City proved all or part of four charges: charge 1, relating to the Carrizales grievance; charge 2, failure to address Couchman's tardiness issues; charge 4, insubordination and threatening behavior; and charge 5, acts relating to the Laidlaw incident. The arbiter found that the most serious of the proven charges was the fourth one, particularly Harris's threat of legal action against anyone who made critical comments about her to investigators. The arbiter also found that the first charge constituted a serious behavioral infraction, whereas the fifth charge, standing alone, would warrant only a "cautionary note." The advisory award issued by the arbiter concluded by stating that Harris was terminated by the City for good cause.

The City's Personnel Commission thereafter noticed a hearing to consider the arbiter's award, and the parties were allowed to submit briefs and present oral argument. Following the hearing, the Personnel Commission voted unanimously to uphold Harris's termination, adopting the arbiter's conclusions and recommendations in full.

Harris then filed a verified petition for writ of administrative mandate (Code Civ. Proc., § 1094.5) in the trial court seeking a writ of mandate ordering the City to reinstate Harris to her former position. The parties submitted briefing and, prior to hearing, the trial court issue a tentative ruling denying Harris's writ petition. After extensive oral argument, the matter was submitted. On September 18, 2013, the trial court issued a 15-

---

**3** "Arbiter" was the term used by the parties, the arbiter himself, and the trial court. As the appeal hearing was advisory and not binding, it was deemed incorrect to refer to the arbiter as an arbitrator.

4

page decision denying Harris's petition for writ of mandate. Judgment was entered on October 8, 2013.

Harris timely appealed.

## DISCUSSION

The superior court reviews administrative decisions pursuant to Code of Civil Procedure section 1094.5.[4] (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 810 (*Fukuda*); *Kazensky v. City of Merced* (1998) 65 Cal.App.4th 44, 51 (*Kazensky*).) Subdivision (b) of section 1094.5 provides that "[t]he inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." Subdivision (c) of section 1094.5 lays out two potential standards for review of the evidence: "Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence. In all other cases, abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record."

Section 1094.5, subdivision (c) does not specify when a trial court is authorized to exercise its independent judgment on the evidence and when it is required to act otherwise. Case law, however, has established that the court must exercise its independent judgment when the decision of the agency "substantially affects a fundamental vested right." (*Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 32; see also *Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 789.)

---

[4] All further statutory references are to the Code of Civil Procedure, unless otherwise noted.

As the trial court here recognized, this matter was subject to the independent judgment standard of review. This is because "'[d]iscipline imposed on city employees affects their fundamental vested right in their employment.'" (*Kazensky, supra*, 65 Cal.App.4th 44, 52, quoting *McMillen v. Civil Service Com.* (1992) 6 Cal.App.4th 125, 129.) The trial court, therefore, "'"was required to exercise its independent judgment on the evidence and find an abuse of discretion if the [agency's] findings of [the employee's] misconduct were not supported by the weight of the evidence.'" (*Kazenzky*, *supra*, 65 Cal.App.4th at p. 52.) This standard required the trial court to weigh the evidence and determine credibility of witnesses. (*Barber v. Long Beach Civil Service Com.* (1996) 45 Cal.App.4th 652, 658.)

The independent judgment standard does not apply to this Court, however. "Even when, as here, the trial court is required to review an administrative decision under the independent judgment standard of review, the standard of review on appeal of the trial court's determination is the substantial evidence test." (*Fukuda, supra,* 20 Cal.4th 805, 824.) If the trial court's factual findings and conclusions are supported by substantial evidence, we uphold them. (*Pasadena Unified Sch. Dist. v. Commission on Professional Competence* (1977) 20 Cal.3d 309, 314.) Nevertheless, we review questions of law de novo and will reverse a material error of law. (*Broney v. California Com. on Teacher Credentialing* (2010) 184 Cal.App.4th 462, 472; *Thornbrough v. Western Placer Unified School Dist.* (2013) 223 Cal.App.4th 169, 200.)

## I. Failure to Read the Entire Record

Harris's primary argument on appeal is that the trial court erred by failing to read the entire administrative record. At the hearing, the trial court, when discussing credibility issues with Harris's counsel, stated: "To be honest—did I spend every waking moment reading 18 volumes? No. I read the portions that were cited by the parties in their briefs, and I actually read all of them—at least those two dates from Mr. Floate's testimony. I looked at your client's testimony in total to the extent I could find it to get a flavor for her credibility in her statements, even if you didn't cite them. I looked for sections of Mr. Galvez—the supervisor's testimony. But did I stand and go from

6

beginning to end? No, I did not. . . . So if there are other portions that I missed, I missed it because the parties didn't cite it to me, and I didn't look for it." The court continued: "It's not my job, also, to go through thousands of pages—thousands and thousands of pages of administrative record hunting to make arguments for the parties if they don't do that themselves, even though I will exercise and have exercised independent review of the record . . . ." Harris's counsel responded to the trial court's statement by saying, "I completely understand, your Honor. . . . I'm thinking, if you read from beginning to end, you probably get a better flavor for what is happening, but I appreciate the limitations of the court also."

Despite counsel's response in the trial court, appellant now asserts that the court's failure to review the entire record was reversible error. Harris points out that certain opinions examining the trial court's duties in reviewing administrative decisions have declared: "The substantial evidence test requires the trial court to review the entire record." (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143, fn. 10; see also *Wences v. City of Los Angeles* (2009) 177 Cal.App.4th 305, 313 ["The trial court must not only examine the administrative record for errors of law, but must also conduct an independent review of the entire record to determine whether the weight of the evidence supports the administrative findings."].) Harris cites to no case, however, in which the trial court's failure to read each and every page of the administrative record constituted grounds for reversal.

Although we can contemplate situations in which the trial court's failure to review the entire administrative record could constitute reversible error, this is not that sort of case. The trial court's 15-page decision denying appellant's writ petition and the court's statements at oral argument showed a firm grasp of the evidence presented. The trial court read the testimony of the three most critical witnesses: Harris, Floate, and Galvez. The trial court's decision also cited to testimony from at least six other witnesses and examined a range of documentary exhibits. Furthermore, the trial court made its own credibility determinations. In short, it is clear that the court reviewed an extensive portion of the 3,935-page administrative record.

7

Moreover, simply because the trial court operated under the independent judgment standard did not mean that Harris had no obligation to show how the administrative decision was incorrect. "In exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda*, *supra*, 20 Cal.4th 805, 817.) The trial court considered all arguments made by Harris and reviewed all portions of the record cited by the parties, and independently concluded that her termination was proper.

Indeed, Harris does not explain how the trial court's decision would have changed if it had read the entire record. "'Error of law is not reversible unless, on an examination of the record, it appears to have resulted in a miscarriage of justice.' (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 322, p. 369; see Cal. Const., art. VI, § 13.)" (*Broney v. California Com. on Teacher Credentialing*, *supra*, 184 Cal.App.4th 462, 472.) "We will not reverse for error unless it appears reasonably probable that, absent the error, the appellant would have obtained a more favorable result." (*Khan v. Medical Board* (1993) 12 Cal.App.4th 1834, 1841.) In the trial court and on appeal, Harris did not identify any part of the record that the trial court failed to review that would have had a material impact on its decision.

This Court *has* reviewed the entire administrative record. While it appears that the trial court did not review certain testimony that was generally favorable to Harris—such as that of Victoria Valverde, an executive secretary, or Donald Rodriguez, a senior maintenance worker—neither witness testified regarding two of the most severe instances of misconduct, the insubordination involving Galvez and the Carrizales incident. In addition, the trial court found that Floate—whose testimony supported the most severe charges—was "honest and credible, even if inconsistent at times." In contrast, the court found that Harris "was not a credible witness concerning certain key issues." There is no basis to find that a review of the entire record would have led the trial court to find that

8

Floate was not a credible witness or that Harris was.[5] Reversing for the trial court to read the entire record, therefore, would be nothing more than an "idle act," something that the law does not require. (Civ. Code, § 3532.)

## II. Substantial Evidence Supports the Trial Court's Findings

Harris's remaining arguments largely focus on the trial court's assessment of various witnesses' credibility. These arguments provide no ground for reversal.

### A. Charge 1

On January 1, 2008, Harris was on vacation and Floate was acting as the supervisor in charge of the "yard," the term generally used for the department of public works location where Harris worked. Carrizales called Floate and asked to take January 2, 2008, off as an "'emergency' vacation day," even though employees were previously informed that the ability to take time off around the holiday season was limited due to staffing needs. Floate granted Carrizales's request. When Harris returned from vacation, she instructed Floate to "write up" Carrizales for taking an unauthorized day off. Carrizales was given a disciplinary memorandum and was denied pay for January 2. Carrizales thereafter filed a grievance and, after reviewing the facts, Galvez reversed Harris's decision and reinstated Carrizales's compensation for January 2.

The City, in its notice of termination to Harris, wrote: "After you returned from vacation, you wrote a memo which misrepresented the facts and had Mr. Floate sign the memo which reversed the vacation day and instructed payroll to deduct one day of salary (nine hours of vacation from Mr. Carrizales' leave bank). Despite repeated protests from Mr. Floate, you caused a reduction in Mr. Carrizales' pay for the pre-approved day off from work on January 2, 2008. . . . [¶] . . . Even though you knew that Mr. Floate had authorized the day off, you took action to reverse Mr. Floate's authorization which

---

[5] Harris's July 28, 2014 request for judicial notice, in which she asks us to take notice of a 2014 criminal conviction concerning a subject matter with no connection to this case, is denied as irrelevant. (*Hughes Electronics Corp. v. Citibank Delaware* (2004) 120 Cal.App.4th 251, 266, fn. 13 ["As a general matter, judicial notice is not taken of matters irrelevant to the dispositive points on appeal."].)

undermined Mr. Floate's authority as the Supervisor-in-Charge. . . . [¶] This incident demonstrates your disregard of the City's personnel rules, policies and procedures."

Both the arbiter and the trial court found that Harris directed Floate to write up Carrizales for taking an unauthorized day off even though she knew that Floate had given his authorization. Substantial evidence supported this determination.

Harris argues that Floate could not have authorized the day off because he initialed the disciplinary memorandum stating that Carrizales's failure to report to work was "unauthorized and unexcused." In testimony, Floate replied "Correct" to the question, "You would not have put your initials on the document if the document did not state truthful information, correct?" But Floate qualified this answer by stating, "I initialed it to just go through with the procedure." Furthermore, Floate testified that he told Harris that he gave Carrizales the time off and did not want to write him up. He also testified that he only wrote 20-40 percent of the disciplinary memorandum and that Harris wrote the remainder, including the language stating that the day off was unauthorized and unexcused.

Again, the trial court found Floate's testimony to be "honest and credible, even if inconsistent at times." This conclusion is supported by the record, as is the finding that the City met its burden in proving the first charge.

**B. Charge 2**

Substantial evidence also supported the trial court's finding on the second charge. The notice of termination stated that Harris was "aware that Senior Maintenance Worker Steve Couchman has had significant issues concerning his punctuality and ability to arrive to work in a timely manner. Mr. Couchman is responsible for the daily work assignment of his crew, including the proper set-up of tools and equipment to ensure timely departure from the Maintenance Yard to their respective work sites. Thus, Mr. Couchman's late arrival to work has a significant impact on the coordination and dispatch of the 'Street' crew for which he is responsible. . . . Nonetheless, you failed to properly address Mr. Couchman's significant pattern of late arrival to work."

10

In finding that the weight of the evidence supported the arbiter's findings that the punctuality related issues of charge 2 were true, the trial court wrote, "the issue here is not when exactly Couchman was late to work and how late he was, but whether [Harris], as a supervisor, should have been documenting his lateness to ensure proper time-keeping and payroll, and counseling Couchman in an effort to address the problem, particularly given its impact on his crew and the time lost as they waited for him to show up so they could begin work."

Harris argues that she documented Couchman's tardiness by requiring him to complete "transaction forms," and that, after she counseled him, his attendance improved. It appears from the record, however, that Couchman was frequently tardy and that it negatively impacted his crew. Mario Medina, a maintenance worker, testified that Couchman was late to work two to three times a week. Rafael Pena, another maintenance worker, testified that Couchman was tardy three to five times a week. Tim Kinman testified that Couchman would sometimes be half an hour to an hour late to work. Gus Martinez, who worked on Couchman's crew, testified that when Couchman was late, he and the rest of the crew would sit in the back of the yard, waiting for instructions.

Further, the record shows that Harris did not adequately document Couchman's tardiness. When asked whether she documented accommodating Couchman for being late, Harris replied, "It was not documented in writing." Further, when asked how she documented Couchman's reasons for requesting accommodation, Harris stated, "Just in the back of my mind, I guess." This was clearly inadequate documentation. The trial court's finding on the second charge, therefore, was supported by substantial evidence.

## C. Charge 4

The final charge that the trial court considered was charge 4, relating to insubordination and threatening behavior on the part of Harris.

The first part of this charge pertained to Harris's act of bursting into Galvez's office and questioning him about the investigation. The June 2008 admonishment memorandum given to Harris ordered her to cooperate with the investigation and

11

prohibited her from contacting any coworkers who she believed may be associated with the investigation to discuss it. In spite of this admonishment, on July 23, 2008, one day before she was scheduled to be interviewed, Harris entered Galvez's office and demanded that he talk to her about the investigation. She asked him about the status of the investigation, whether he was a part of the investigation, what he knew about it, and whether the investigation was coming "from above." This came after she called him on the telephone that morning five to 10 times seeking information about the investigation. Galvez noted that, when Harris entered his office, "[h]er demeanor . . . was one of intimidation."

This behavior clearly constituted a violation of the City's admonishment memorandum, and, as found by both the arbiter and the trial court, it was an act of insubordination. On appeal, Harris argues "that there was virtually no evidence introduced that Appellant believed Mr. Galvez was 'associated with the investigation.'" This is a specious argument. Galvez was Harris's supervisor, the person to whom she directly reported, so it could safely be assumed that he was associated with the investigation. Furthermore, if Harris had no belief that Galvez was involved in the investigation, there appears to be little reason that she would be adamant to speak with him the day before her investigatory interview. Harris also avers that, since Galvez refused to answer her questions, she did not "discuss" the matter with him. But the admonishment memorandum prohibited her from "contacting" those involved with the investigation to discuss it. Harris certainly contacted Galvez.

Harris next contends that the admonishment memorandum was impermissibly overbroad. The opinion relied on by Harris for this assertion, *Los Angeles Police Protective League v. Gates* (C.D.Cal. 1984) 579 F. Supp. 36, does not support her position. In *Gates*, the plaintiffs challenged an order prohibiting a police officer from discussing an investigation with other officers involved in the investigation. (*Id.* at p. 40.) The court found that the plaintiffs' "overbreadth challenge" was "without merit." (*Ibid.*) In addition, as noted by the trial court here, a similar investigation-related restriction—which prohibited a school custodian from speaking to other employees about

12

an ongoing investigation—was found to pass constitutional muster in *Farhat v. Jopke* (6th Cir. 2004) 370 F.3d 580, 598.

Finally, Harris argues that the record does not support the trial court's finding on the second component of charge 4—that Harris told Floate she would take legal action against anyone who made disparaging comments about her to the investigator and that this threat affected Floate's willingness to participate in the investigation. Harris is incorrect. Floate testified that he feared participating in the June 2008 investigation because Harris told him "If anybody said any derogatory—or anybody had any derogatory statements against her, that she would take legal action." Floate further stated that this fear affected how he responded to the investigator. Thus, the trial court's finding was supported by substantial evidence.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


CHAVEZ, J.


HOFFSTADT, J.


13