Filed 8/31/20  Ramos Oil Co. v. Amiri CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| RAMOS OIL CO., INC., | C085868 |
| Plaintiff and Appellant, | (Super. Ct. No. SC20110186) |
| v. | |
| AZAD AMIRI et al., | |
| Defendants and Respondents. | |

Plaintiff Ramos Oil Co., Inc. (Ramos) sought to void a transfer of real property between the defendants as fraudulent under the Uniform Voidable Transactions Act (Civ. Code, § 3439 et seq., the UVTA).  Ramos sought to execute a judgment lien against the property.  Following a court trial, the trial court ruled the transfer was not fraudulent and the transferee took the property in good faith.

1

Ramos appeals from the judgment.  It contends the trial court's statement of decision failed to make findings on material facts and, as a result, substantial evidence does not support the court's findings.  We agree and reverse.

FACTS AND PROCEEDINGS

Defendant Azad Amiri is a retired businessman.  (We refer to the Amiri defendants by their first names.)  Over the course of his career, he created companies that constructed and managed gas stations and sold petroleum wholesale.  He also owned a management company that provided accounting services to gas stations.  As part of his work, he participated in many real property transactions.

In 1991, Azad partnered with a former employee, Sarbjit Kang, to lease a gas station in South Lake Tahoe.  The station was called the Swiss Mart and was located at 913 Emerald Bay Road.

In 1998, the Lahontan Regional Water Quality Control Board (Water Board) discovered that the Swiss Mart's underground storage tanks had leaked gasoline and diesel into the soil and groundwater.  The Water Board issued an order to abate the pollution.

Azad and Kang paid for the remediation and then sought reimbursement from a state fund.  By late 2002, the state had reimbursed them $1.495 million for remediation expenses.  From that point on, the property owners were personally responsible for the costs of any further remediation.

In 2002, ownership of the Swiss Mart changed.  Kang organized defendant Kang Properties, Inc. (KPI), to which he and Azad transferred ownership of the Swiss Mart.  Azad agreed to continue as a responsible party for remediating the site.  By that time, Kang had acquired other gas stations, and he transferred ownership of those stations to KPI as well.  Azad provided management services to Kang personally and his other stations but not to KPI.

2

Despite four years of remediation, the Swiss Mart property was not fully decontaminated by 2002. From 2003 through 2006, Azad and Kang paid $274,000 for additional remediation at the site. In 2007, Azad paid another $25,000 for remediation.

At the end of 2007, the Water Board issued another abatement order. Kang did not have money to pay for this round of remediation. Azad knew his daughter, Haleh Amiri, had an interest in buying a gas station. He spoke with her about paying for the remediation.

Haleh testified that she became interested in the Swiss Mart in 2007 when she overheard her father and Kang talking about listing it for sale. She asked how much they wanted for it, and they said the property had contamination that needed to be remediated. She asked how much they thought it would cost to clean it up. They gave her the invoices and showed her that it could cost up to about $500,000 to clean it up, but it probably would not be that much. She thought if the property was clean, it would be worth $800,000 or more.

At the time, Haleh did not have $500,000, so she asked several family members if they could loan her the money. Her uncle (and Azad's brother), defendant Reza Amiri, was willing to assist. Reza is a retired accountant who lives in England. He last visited the United States sometime in 2012 or 2013.

In 2008, Reza advanced slightly less than $250,000. He deposited the money directly into a bank account set up for funds to be used to pay for the remediation, and Azad paid the remediation costs from that account. In 2008, Azad spent $229,716 for remediation work at the Swiss Mart.

KPI ran into more problems in 2008. In March of that year, Ramos, a gasoline wholesaler, filed an action in Yolo County against Kang and later KPI for failing to pay for gasoline delivered to a KPI-owned station in Brentwood. Another wholesaler, Tower Energy Group, also sued KPI.

3

In addition, in late 2008, the Water Board conducted more testing at the Swiss Mart site and discovered that contaminated soil remained. Lisa Dernbach, an engineering specialist at the Water Board who oversaw the cleanup, estimated at the time in conversations with the consultant overseeing the site that remediating this remaining contamination would cost approximately $50,000. The Water Board directed that the contaminated soil be excavated and removed. It also issued a civil complaint seeking a fine of as high as $450,000 for KPI's noncompliance with the Water Board's 2007 remediation orders.

At this point, Kang asked Azad to take over KPI and try to save it. On December 18, 2008, Kang and Azad entered into an agreement under which Kang transferred all his shares in KPI to Azad, and Azad became the company's president. As owner of KPI, Azad possessed eight gas stations, including the Swiss Mart, two unimproved lots, and KPI's liabilities. He agreed with Kang that if he sold the Swiss Mart, the purchaser would lease the property back to Kang for 10 years at $5,000 per month. Azad also agreed that if he sold any property, Kang would receive 50 percent of the sale proceeds remaining after KPI's liabilities were paid.

Azad's plan was to reorganize KPI and find a buyer for the stations. As part of that process, on January 22, 2009, he filed articles of incorporation for three companies that would eventually purchase some of the properties. One of those companies was defendant Tahoe Blue Property, Inc. (Tahoe Blue).

Haleh testified it was Reza's idea to form Tahoe Blue. At the end of 2008, she learned of the additional remediation that needed to be done at the Swiss Mart, and she needed to borrow an additional $100,000 to finish the work. She agreed with Reza to set up Tahoe Blue for this purpose. He would put up the $100,000 in exchange for becoming Tahoe Blue's majority shareholder and for a percentage of the business. Haleh and another person would own the minority shares. Azad filed Tahoe Blue's articles of incorporation as an agent.

4

The other two companies for which Azad filed articles of incorporation were Sacramento/Dunnigan Property, Inc. (Sacramento/Dunnigan) and San Francisco/Moraga Property Inc. (San Francisco/Moraga). Kang's former wife had an interest in Sacramento/Dunnigan. Reza owned San Francisco/Moraga, and the company identifies Reza and Azad as officers and directors.

Tahoe Blue held its first officers and board meeting on January 22, 2009, the same day its articles of incorporation were filed. Haleh was designated as president and vice president; Haleh's mother was appointed secretary; and Reza was named the treasurer.

On February 25, 2009, KPI transferred the Swiss Mart to Tahoe Blue. No cash changed hands. As consideration, Tahoe Blue agreed to pay up to $500,000 for remediation costs. Tahoe Blue also would lease the Swiss Mart back to KPI or its designee for 10 years at $5,000 per month in rent but would forego rent for the first three years. Tahoe Blue also agreed to purchase a neighboring property KPI owned by assuming the loan on that lot.

On the same day, February 25, KPI transferred title in additional gas stations to the other companies Azad had organized. It transferred title in gas stations in Sacramento and Dunnigan to Sacramento/Dunnigan, and it transferred title in a station in Moraga to San Francisco/Moraga. For each of these, the purchase price was the purchaser's assumption of the existing debt on the property. In his deposition, Azad stated that at the time of these transfers, KPI was in the process of losing all its properties.

One month later, on March 25, 2009, KPI transferred title in two more gas stations. It transferred title in a station in San Francisco to San Francisco/Moraga and a station in Davis to Sacramento/Dunnigan. Again, the purchase price was the purchaser's assumption of the existing debt on the property.

On the same day, March 25, the grant deed transferring title in the Swiss Mart from KPI to Tahoe Blue was recorded.

The following day, March 26, the Yolo County Superior Court granted Ramos's application for a writ of attachment against KPI. The order was in the amount of $102,488.02.

In May 2009, the remaining remediation work was completed at the Swiss Mart site. Tahoe Blue paid $48,429 to complete that work. Meanwhile, in April 2009, the Water Board rescinded its earlier complaint for a civil fine and issued a new complaint against KPI and Kang for failure to comply with previous orders. In July 2009, the Board fined KPI and Kang $222,000 on the new complaint. At that time, KPI owned no equity. The following year, on September 21, 2010, the Water Board issued a "no further action" letter indicating it required no further remediation at the Swiss Mart.

Ramos obtained a judgment in its Yolo County case against KPI in May 2011. The Yolo County Superior Court awarded damages in the amount of $145,658.93 and attorney fees of $132,030.50 against KPI, Kang, Azad, and others. Ramos recorded an abstract of judgment with the El Dorado County Recorder in August 2011, which placed a lien on the Swiss Mart. It discovered then that KPI had transferred title in the Swiss Mart to Tahoe Blue.

On September 7, 2011, Ramos filed this action. It sought damages and an order setting aside KPI's transfer of the Swiss Mart to Tahoe Blue for alleged fraudulent conveyance of the property and conspiracy. The defendants by the time of trial were Azad, Reza, KPI, and Tahoe Blue.

In September 2013, Tower Energy Group obtained a judgment in its favor against Haleh in the amount of $251,871.09, and against Kang and KPI in the amount of $192,359.59.

During the following two months of October and November 2013, Azad, KPI, and Tahoe Blue filed Chapter 7 bankruptcies. Tahoe Blue's schedule of assets listed the Swiss Mart as one of its assets. Eventually, the Swiss Mart was sold at auction. Ramos

bid $75,000, but Azad, bidding on behalf of Reza, bought the property with a bid of $100,000. The bankruptcy court confirmed the sale to Reza.

This case came to trial in 2017 where the above evidence was presented in a court trial. Defendants introduced no documentary evidence of a loan from Reza to Azad or KPI. KPI's 2008 tax return did not list any loans to KPI. Defendants introduced no documentary evidence of a loan from Reza to Tahoe Blue other than what was mentioned in the transfer agreement. It was Azad and Reza's custom that financial agreements between them were made orally.

Both sides at trial introduced expert testimony on the value of the Swiss Mart property at the time of its transfer to Tahoe Blue in March 2009. Ramos's appraiser, John Nicolaou, stated the property was worth between $400,000 and $550,000. His range assumed the property owner would expend $50,000 for the remaining remediation work. He appraised the property as if it was not contaminated and then deducted the $50,000 from that value.

The defendants' appraiser, Benjamin Johnson, testified that as of the date of its transfer, the Swiss Mart was worth $0. He assumed the amount of future remediation at that time was unknown. He stated Azad told him that his (Azad's) best estimate to clean up the site as of the date of the transfer was between $250,000 and $500,000, but Azad gave Johnson no engineering estimates or summary of costs supporting his opinion. Had the property not been contaminated, Johnson would have appraised it at $350,000. But with the unknown level of contamination, the risk of liability, the stigma associated with contaminated property, and the state of the economy at that time, Johnson believed the property had no value.

Johnson also testified that when he met with Azad, Azad represented that the sale of the Swiss Mart "was an inter-family transaction[.]" Johnson also understood that Azad represented Tahoe Blue in arranging for his services, and that Tahoe Blue sought the appraisal to provide a basis of value for tax purposes.

Following the trial, the court awarded judgment in favor of defendants, finding the transfer was not fraudulent and was made in good faith and for reasonably equivalent value. We will discuss the court's statement of decision in more detail below.

DISCUSSION

*Sufficiency of the Statement of Decision*

Ramos contends the trial court erred by not making findings on all material issues. Ramos also argues that because it objected to the statement's omissions and the court did not address its objections to the statement, the appellate doctrine of implied findings does not apply. In the resulting vacuum, Ramos contends that substantial evidence supports findings in its favor on those findings the court did not make. We agree that the statement of decision is legally erroneous for omitting adequate findings on the material issue of the Swiss Mart's value, and thus the doctrine of implied findings does not apply.

A.    *Legal background*

Before reviewing the trial court's statement, we briefly discuss the statutory law at issue. In California, civil claims for fraudulent transfers of property are brought under the UVTA. "The purpose of the UVTA is to prevent debtors from placing, beyond the reach of creditors, property that should be made available to satisfy a debt. (*Lo v. Lee* (2018) 24 Cal.App.5th 1065, 1071.) A creditor may set aside a transfer as fraudulent under Civil Code section 3439.04 by showing actual fraud . . . or by showing constructive fraud . . . . (See *Lo v. Lee, supra,* 24 Cal.App.5th at p. 1071; *Optional Capital, Inc. v. DAS Corp.* (2014) 222 Cal.App.4th 1388, 1401-1402.) As a remedy, the creditor may obtain avoidance of the transfer, an attachment or other provisional remedy, and, subject to applicable principles and rules, an injunction or a receiver. (Civ. Code, § 3439.07, subd. (a).)" (*Chen v. Berenjian* (2019) 33 Cal.App.5th 811, 817, fn. omitted.)

Ramos claimed that the defendants' transfer of the Swiss Mart constituted actual fraud. To establish actual fraud under the UVTA, Ramos had to prove that KPI

8

transferred the property to Tahoe Blue "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." (Civ. Code, § 3439.04, subd. (a)(1).)

Proof of fraudulent intent "often consists of inferences from the circumstances surrounding the transfer." (*Filip v. Bucurenciu* (2005) 129 Cal.App.4th 825, 834.) Courts have considered several factors, often called the "badges of fraud," to determine the existence of fraudulent intent. Codified in the UVTA at Civil Code section 3439.04, subdivision (b), these factors include whether (1) the transfer was to an insider; (2) the debtor retained possession or control of the property after the transfer; (3) the transfer was disclosed or concealed; (4) before the transfer was made, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor. (Civ. Code, § 3439.04 , subd. (b).)

"[T]hese factors do not create a mathematical formula to establish actual intent. There is no minimum number of factors that must be present before the scales tip in favor of finding of actual intent to defraud. This list of factors is meant to provide guidance to the trial court, not compel a finding one way or the other." (*Filip v. Bucurenciu, supra*, 129 Cal.App.4th at p. 834.)

Both parties to the transfer may have defenses to a claim of fraudulent transfer. A transferor/debtor may prefer one creditor over another if doing so does not constitute fraud under the UVTA. (*Wyzard v. Goller* (1994) 23 Cal.App.4th 1183, 1188-1189.) Also, if a transferee took the property in good faith and for a reasonably equivalent value, the transfer is not voidable. (Civ. Code, § 3439.08, subd. (a).)

The party seeking to void the transfer bears the burden of proving fraudulent intent by a preponderance of the evidence. (Civ. Code, § 3439.04, subd. (c).) The transferee has the burden of proving good faith and reasonably equivalent value by a preponderance of the evidence. (Civ. Code, § 3439.08, subds. (f)(1), (g).)

B.      *The statement of decision*

The trial court's statement of decision travels a winding path. It suggests the transfer might be fraudulent, finds Tahoe Blue accepted the transfer in good faith and for a reasonably equivalent value, but concludes by finding the transfer was not fraudulent.

The court stated the elements of a claim for fraudulent transfer. To recover, Ramos had to establish it had a right of payment from the debtor for a sum certain, the debtor had transferred the subject property, and the debtor transferred the property with the intent to hinder, delay or defraud one or more of its creditors.

The court stated as a matter of fact that Ramos had a judgment lien against the Swiss Mart.

The court next found that the transfer bore some of the badges of fraud. The transfer occurred between insiders. KPI was left with no real property assets after the transfer and the other transfers it made some days later. KPI and Kang knew at the time of the transfer that a judgment was likely to be rendered against them in the future. However, the court stated that the suit involved only the Swiss Mart, and at the time of transfer no judgment had been entered against KPI and Kang.

At this point, without expressly finding fraudulent intent, the court turned its attention to the defendants' defense of good faith. It said the matter of good faith was a subjective assessment of the evidence. To find good faith, it had to consider factors such as how a potential buyer might evaluate the property, whether a buyer would impose excessive discounts, and whether a buyer could successfully pay the reasonable value of the property and pay and operate the business on the property.

10

The court recognized the property was conveyed to insiders, but it stated it had to consider the financial strength and qualifications of Tahoe Blue, which it found to be "undisputed." It also found the transfer occurred prior to a judgment lien being perfected. That a lawsuit had been filed did not require the court to presume the transfer was fraudulent. From these points, the court concluded, "Given the subjective factors presented by the evidence in this case, the court finds that the conveyance . . . was in good faith."

The court next answered whether the property was conveyed for a reasonably equivalent value, the second element of the good faith defense and also a badge of fraud. The court disregarded both appraisers' valuations. It found Ramos's appraiser had undervalued the cost of possible remediation as of the time of the transfer, and the defendants' appraiser had overstated the cost of possible remediation without any supporting evidence.

The court did not reach a valuation of the property other than to say it was worth somewhere between $0 and $500,000 at the time of transfer. It nonetheless found that the transfer was for reasonably equivalent value. It found that at the time of the transfer, the costs of the remaining remediation appeared to be significant, and KPI was facing a potential $450,000 fine by the Water Board. In exchange, Tahoe Blue agreed it would pay up to $500,000 for remediation and other associated costs for the Swiss Mart and it would be responsible for the loan "on the property." (The loan was on a neighboring property included in the deal, not the Swiss Mart property.)

At this point, and despite having just explained its equivalency analysis, the court reverted to the issue of whether Ramos had established fraud. Without analyzing the issue further, the court concluded, "In consideration of the factors listed in Civil Code section 3439.04(b) [the 'badges of fraud'] and the factor for 'reasonable equivalent value' of the property, the court finds that the transfer was not a fraudulent transaction. [¶] Judgment for defendants, plaintiffs have not met their burden."

11

C.    *Analysis*

Ramos contends the trial court erred in its statement of decision by not making findings on all material issues.  It argues the court erred by not making a finding for each of the badges of fraud set forth in Civil Code section 3439.04(b) except those the court addressed, and even those it addressed insufficiently.  Ramos objected to the court's tentative statement of decision for not making these specific findings.  It specifically objected to the evidentiary findings the court made concerning the Swiss Mart's value as part of deciding the transfer was for a reasonably equivalent value.  The trial court in its final statement stated it considered the objections, but it made no substantive changes to its tentative statement.  Ramos argues that because the final statement does not address material issues, we may not presume factual findings in support of the decision.

Our peers in the First Appellate District recently explained the purpose of a statement of decision and the effect an objection to a proposed statement may have on our scope of review.  We quote from them at length:  " 'A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness.' (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 (*Arceneaux*).)  Specifically, '[u]nder the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision.' (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 48 (*Fladeboe*).)

"When a proper request for a statement of decision has been made, the scope of appellate review may be affected.  (See Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2016) ¶¶ 16:197 to 16:216.5, pp. 16-45 to 16-49.)  Under [Code of Civil Procedure] section 632 [section 632], upon a party's request after trial, the court must issue a statement of decision 'explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial.'  And under [Code

12

of Civil Procedure] section 634 [section 634], if the statement of decision does not resolve a controverted issue or is ambiguous, and the omission or ambiguity was brought to the attention of the trial court, 'it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue.' (See *Culbertson v. Cizek* (1964) 225 Cal.App.2d 451, 465-466; see also *Arceneaux*, *supra*, 51 Cal.3d at pp. 1133-1134.)

"The statutory statement of decision process following ' "the trial of a question of fact by the court" . . . [¶] . . . "is for the benefit of the court and the parties. To the court it gives an opportunity to place upon [the] record, in definite written form, its view of the facts and the law of the case, and to make the case easily reviewable on appeal by exhibiting the exact grounds upon which judgment rests. To the parties, it furnishes the means, in many instances, of having their cause reviewed without great expense." ' (*Whittington v. McKinney* (1991) 234 Cal.App.3d 123, 126-127, italics and citations omitted.) A proper statement of decision is thus essential to effective appellate review. 'Without a statement of decision, the judgment is effectively insulated from review by the substantial evidence rule,' as we would have no means of ascertaining the trial court's reasoning or determining whether its findings on disputed factual issues support the judgment as a matter of law. (*Gordon v. Wolfe* (1986) 179 Cal.App.3d 162, 168.)

"[¶] . . . [¶]

"Even where proper procedure under sections 632 and 634 has been followed punctiliously, '[t]he trial court is not required to respond point by point to the issues posed in a request for statement of decision. The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case.' (*Golden Eagle Ins. Co. v. Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1379-1380; accord, *Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 500.) 'When this rule is applied, the term "ultimate fact" generally refers to a core fact, such as an essential element of a claim.' (*Central Valley General*

13

*Hospital v. Smith* (2008) 162 Cal.App.4th 501, 513.) 'Ultimate facts are distinguished from evidentiary facts and from legal conclusions.' (*Ibid.*) Thus, a court is not expected to make findings with regard to 'detailed evidentiary facts or to make minute findings as to individual items of evidence.' (*Nunes Turfgrass, Inc. v. Vaughan–Jacklin Seed Co.* (1988) 200 Cal.App.3d 1518, 1525 [].) In addition, '[e]ven though a court fails to make a finding on a particular matter, if the judgment is otherwise supported, the omission is harmless error unless the evidence is sufficient to sustain a finding in favor of the complaining party which would have the effect of countervailing or destroying other findings.' (*Ibid.;* accord, *Kazensky v. City of Merced* (1998) 65 Cal.App.4th 44, 67-68.)" (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981-983, fns. omitted.)

A principal or material issue is one "which is relevant and essential to the judgment and closely and directly related to the trial court's determination of the ultimate issues in the case." (*Kuffel v. Seaside Oil Co.* (1977) 69 Cal.App.3d 555, 565.)

We agree with Ramos that the statement of decision omits findings on a material issue. There can be no dispute that the value of the Swiss Mart was a material issue. The trial court made no finding on the property's value. Indeed, it disregarded the appraisers' valuations. Yet the court based its judgment primarily on finding KPI transferred the Swiss Mart to Tahoe Blue for a reasonably equivalent value. It is the only significant finding the court made that supported its conclusion that the transfer was not fraudulent. But without determining the Swiss Mart's actual value, the court could not determine whether the transfer was for a reasonably equivalent value. (See *Marriage of Hargrave* (1985) 163 Cal.App.3d 346, 353-354 [the " 'factual and legal basis' " for valuation of property must be set forth in the statement of decision].)

Because the trial court did not determine the Swiss Mart's value, we are unable to determine whether substantial evidence supports the court's finding that the transfer was for a reasonably equivalent value. No doubt Tahoe Blue received the Swiss Mart for an exchange of value. But without deciding upon the property's value, the trial court had no

14

way to determine whether a promise to pay for remediation up to $500,000 (when the actual payment made was less than $50,000) and a 10-year lease-back rent free for the first three years was reasonably equivalent to the Swiss Mart's value. Because the court did not make a finding on this material issue, the doctrine of implied findings does not apply to this appeal.

Moreover, because a finding of reasonably equivalent value was crucial to the trial court's decision, the omission of determining the Swiss Mart's value was not harmless. The finding of reasonably equivalent value is one of the badges of fraud and also one of the two factors required to prove a defense. Without that finding, the court's remaining findings do not support its conclusion the transfer was not a fraudulent transaction. The court found the transfer was between insiders, one of the badges of fraud. It found that after KPI transferred the properties in February and March 2009, the company was left "with no real property interests," another badge of fraud. The trial court found there was "no question" that KPI and Kang knew at the time of transfer that a judgment would likely be rendered against them in the Yolo County action, another badge of fraud. As to the defense, the court made findings of good faith, but the good faith defense does not survive without showing the transfer was for a reasonably equivalent value. (Civ. Code, § 3439.08, subd. (a).) And we have already determined the court did not support that finding.

In short, by not determining the Swiss Mart's value, the trial court sheared its statement of decision of any findings that would support its judgment that the transfer was not fraudulent. And, because the property's value was a material issue, we do not imply that any such findings were made.

Normally, the proper appellate remedy for correcting an inadequate statement of decision is to remand with directions to provide a legally sufficient statement. (See *Gordon v. Wolfe, supra,* 179 Cal.App.3d at p. 168.) However, that is impossible here. The trial judge who heard the case is no longer available because he has retired.

15

Therefore, the only appropriate appellate remedy in this case is a remand for a new trial. Because of this disposition, we do not address the parties' remaining arguments.

## DISPOSITION

The judgment is reversed, and the matter is remanded for a new trial. Costs on appeal are awarded to Ramos.[1] (Cal. Rules of Court, rule 8.278(a).)

_____

HULL, Acting P. J.

We concur:

_____

MURRAY, J.

_____

HOCH, J.

---

[1]     The requests for judicial notice filed by Reza and Ramos are denied as moot.